ANNETTE KINGSLAND ZIEGLER, J.
¶ 1. This appeal is before the court on certification by the court of appeals, pursuant to Wis. Stat. § 809.61 (2009-10).[1] David and Marcia Rosecky (the Roseckys) entered into a Parentage Agreement (PA or the agreement) with Monica and Cory Schissel (the Schissels) whereby the parties agreed that Monica Schissel (Monica) would become pregnant and carry a child for the Roseckys. The agreement provided that "[the Roseckys] shall be *92 the legal parents of [the] Child," that the "Child's best interests will be served by being in [the Roseckys'] legal custody and physical placement," and that "[t]he parties will cooperate fully in any parentage proceedings to determine [the Roseckys] as [the] [C]hild's legal parents, . . . including but not limited to termination of parental rights and adoption." Monica became pregnant through artificial insemination using her egg and David Rosecky's (David) sperm. On March 19, 2010, Monica gave birth to F.T.R. Shortly before F.T.R.'s birth, Monica informed the Roseckys she no longer wanted to give up her parental rights. She further sought custody and placement of ET.R. David responded by seeking enforcement of the PA. The Columbia County Circuit Court, Judge Alan J. White, determined that the PA was not enforceable, and after a trial, awarded sole custody of F.T.R. to David, primary placement to David, and secondaiy placement to Monica. David appealed, seeking enforcement of the PA and sole custody and placement of F.T.R. The court of appeals certified to this court the question of "whether an agreement for the traditional surrogacy and adoption of a child is enforceable."
¶ 2. We granted the court of appeals' certification and now reverse the order of the circuit court.
¶ 3. Aside from the termination of parental rights provisions in the PA at issue, we conclude a PA is a valid, enforceable contract unless enforcement is contrary to the best interests of the child. While the traditional defenses to the enforcement of a contract could apply, none appear to render the entire PA in this case unenforceable.
¶ 4. We also conclude that the circuit court erroneously exercised its discretion by excluding the PA and rendering its custody and placement decision without *93 consideration of the PA. We reverse the circuit court's determination that the PA is unenforceable and remand for a hearing on custody and placement, wherein the terms of the PA are enforced unless enforcement is contrary to the best interests of P.T.R.
I. FACTUAL BACKGROUND
¶ 5. Marcia and Monica were good friends for many years, having met in grade school. Each participated in the other's wedding. The Roseckys were godparents to the Schissels' youngest daughter.
¶ 6. In 2004, and again in 2008, Marcia was diagnosed with leukemia. After receiving treatments, she is currently in good health and the doctors consider the leukemia "a nonissue." However, her eggs are no longer viable and she is unable to have biological children.
¶ 7. In 2004, and again in 2008, Monica offered to act as a surrogate for the Roseckys. Monica testified that she wanted to help the Roseckys: "I was [Marcia's] friend. I offered to do this.... I orchestrated this whole thing. This whole thing was my doing. I offered. I carried. I said I would do it." In 2008, the Roseckys accepted Monica's offer. The parties discussed using a donor egg, but decided to use Monica's egg because they could be sure of Monica's family history, there was a higher chance of having multiples using a donor egg, and Monica preferred to use her own egg. Marcia expressed concern that Monica would have trouble giving up her biological child, but Monica reassured Marcia that she would allow the Roseckys to raise the child.
¶ 8. The parties had extensive conversations about the legal ramifications of the surrogacy before Monica became pregnant. The parties discussed and agreed that Monica and the child would have no legal *94 relationship, Monica would not have formal custody and placement of the child, Monica would see the child through informal social visits, and the Roseckys would raise the child. Both parties retained counsel, and the attorneys reduced the agreement to writing. The parties negotiated terms in the agreement, and sent revised drafts back and forth. The parties acknowledge that the written agreement is an accurate reflection of the discussions they had before Monica became pregnant. Monica became pregnant in June 2009 through artificial insemination using her egg and David's sperm.
¶ 9. On November 7, 2009, the agreement was signed by David as the "father," and Marcia as the "mother." On November 17, 2009, the agreement was also signed by Monica as the "carrier," and Cory Schissel (Cory) as the "husband." The attorneys for both parties also signed the agreement.
¶ 10. Most importantly for this opinion, the PA contains the parties' agreement as to parentage, legal custody, and physical placement.[2]
*95 ¶ 11. Cory and Monica have five children together. Before Monica became pregnant with F.T.R., the Schissels did not intend to have any more children; to that end, Cory had a vasectomy.
¶ 12. Toward the end of the pregnancy, the parties had a falling out. It suffices to say that there were several events resulting in hurt feelings and lack of trust among the parties. In any event, shortly before F.T.R. was born, Monica reneged on the PA and refused to terminate her parental rights. On March 19, 2010, Monica gave birth to F.T.R. and allowed F.T.R. to go home with the Roseckys from the hospital.
II. PROCEDURAL POSTURE
¶ 13. Shortly after F.T.R. was born, the Columbia County Circuit Court appointed the Roseckys as the temporary guardians of F.T.R.[3] On May 13, 2010, David filed a separate paternity action in the Waukesha County Circuit Court. On August 2, 2010, Judge Lee S. Dreyfus Jr. adjudicated David to be the father of F.T.R. and transferred the remaining issues to Columbia County to be joined with the existing guardianship case. On September 30, 2010, Monica moved the circuit court for increased custody and placement of F.T.R. David moved for specific performance of the PA, pointing to language in the PA that Monica had waived her right to custody and placement of F.T.R.
¶ 14. The circuit court scheduled two hearings: one to determine interim custody and placement and one to determine the enforceability of the PA. On *96 November 18, 2010, the court held a hearing to determine custody and placement. After hearing testimony from Monica, David, and Marcia, the court determined that it was in F.T.R.'s best interests to maintain the status quo: primary custody and placement with David and two hours of placement per month with Monica.
¶ 15. The parties then briefed the enforceability of the PA. On February 8, 2011, the court held a hearing and determined that the PA was not enforceable. It entered an order to that effect on the same date. The court made several findings regarding the PA. First, it found that "[t]he contract, on its face is clear and unambiguous." Second, the court rejected Monica's argument that the PA lacked consideration because she was already pregnant at the time the agreement was signed. Third, the court made additional findings about the PA:
The parties are each represented by counsel, and were at the time the agreement was drawn. The agreement itself covers virtually every eventuality which could possibly occur during the pregnancy.
There is no claim here by [Monica] that she did not understand the contract when she signed it. Indeed, to a great extent, it appears it was her idea to act as a surrogate in the first instance.
Had [Monica] gone through with the termination of her parental rights, this Court would have no problem upholding the agreement....
However, the court articulated the main issue as "whether the Court can, under these circumstances, force or require the mother to terminate her parental rights." The court determined that it could not force or require Monica to terminate her parental rights because the requirements of Wis. Stat. § 48.41, governing *97 voluntary consent to a termination of parental rights (TPR), were not met. In the same vein, the court also refused to enforce the custody and placement provisions of the PA. The court did not consider the sever-ability clause of the PA.
¶ 16. On February 16, 2011, in anticipation of the custody and placement trial, the court ordered Dr. Beth B. Huebner to complete a custody study to evaluate F.T.R.'s best interests. See Wis. Stat. § 767.405(14). On February 18, 2011, the court entered an interim placement order giving David primary placement and Monica placement of F.T.R. for three hours every other Saturday.
¶ 17. On April 6, 2011, Dr. Huebner filed her report. Her ultimate recommendation was that David should have full custody and placement of F.T.R., and Monica should not have any placement. On April 25, 2011, F.T.R.'s guardian ad litem, Krista E. Miller, filed her report, similarly concluding that David should have full custody and placement, and Monica should not have any placement.
¶ 18. On July 5 and 6, 2011, the court held a trial to determine F.T.R.'s best interests with regard to custody and placement under Wis. Stat. § 767.41. The court heard testimony from David, Marcia, Monica, Cory, Dr. Huebner, Dr. Kenneth H. Waldron (hired by the Roseckys to review Dr. Huebner's report), and Dr. Patrick T. Kane (hired by the Schissels to recommend possible steps to develop a healthy attachment between a parent and a child).
¶ 19. Dr. Huebner testified that it was in F.T.R.'s best interests to have full custody and placement with the Roseckys. She testified that F.T.R. was attached to Marcia, and to displace that attachment could have disastrous consequences. She testified that placement *98 with Monica would be harmful to F.T.R. because of Monica's desire to be his mother and to replace Marcia, which would be confusing for F.T.R. Monica admitted that she referred to herself as "Mom" in interactions with F.T.R. and that she was "seeking to have placement that would allow me to act as his mother." Dr. Huebner testified that the relationship between the Roseckys and the Schissels was essentially dead; a fact to which all of the parties agreed. She testified that allowing Monica to have placement in the current situation— which Dr. Huebner characterized as "beyond high conflict" even though the parties did not swear or yell at each other — would have a negative effect on F.T.R.
¶ 20. Dr. Waldron testified that Dr. Huebner did use the appropriate methodology in gathering data, making findings, and incorporating social science research in her report. Further, Dr. Waldron testified about disrupted secure detachment — where a young child is separated from a caregiver to whom he or she has formed an attachment — and the consequences thereof, including depression, anxiety, mental health problems, behavioral problems, delinquency, trouble maintaining long-term friendships and relationships, and increased thoughts of suicide.
¶ 21. Dr. Kane testified that a child can form more than one attachment, that a new attachment can be formed through a series of increased contacts, but that he did not interview the parties and did not have recommendations specific to this case. Dr. Kane's discussion assumed that the contact was in the best interests of the child. Dr. Kane also discussed that a hostile relationship between parents has negative effects on children, and that Monica's desire to be F.T.R.'s mother could result in anxiety and confusion for F.T.R.
*99 ¶ 22. Marcia, David, Monica, and Cory all testified about the tense relationship between the families. From the Roseekys' perspective, Monica offered to be a surrogate so the Roseekys could start a family, Monica was not abiding by the terms of the agreement, and the Roseekys agreed to use Monica's egg only after she reassured the Roseekys she could allow them to raise the child. From the Schissels' perspective, Monica was being shut out and was not able to visit F.T.R. through social interactions as she had imagined. A precise retelling of the testimony at trial is not necessary for the legal analysis, but it suffices to say that the parties testified about many instances of failed communication, hurt feelings, and tense interactions.
¶ 23. During David's testimony, the court refused to admit the PA as an exhibit and stated that "it's not going to consider it." David's attorney, Steven W Hayes, argued that the PA contained a severability clause, that the court could sever any provisions that it found offensive, and that the PA was relevant to several factors in custody and placement under Wis. Stat. § 767.41(5).
¶ 24. On August 25, 2011, the circuit court awarded sole custody and primary placement of F.T.R. to David and secondary placement to Monica. The court awarded Monica six hours of placement every other weekend until F.T.R. turned two (March 2012), and at that time, Monica was awarded an overnight stay from Friday evening until Saturday evening every other weekend. The court did not consider the PA in any way, but instead relied solely on Wis. Stat. § 767.41 to determine custody and placement. The court reasoned that under Wis. Stat. § 767.41(4)(b), both families were entitled to placement unless "the court finds that physical placement with a parent would endanger the child's physical, mental or emotional health." By granting placement *100 with Monica, the court rejected the expert testimony and the guardian ad ¡item's opinion that the tension between the parties and the separation from attachment figures could endanger F.T.R.'s mental or emotional health: "The possibility that difficulties may occur and that allowing the Schissels to play a role in the child's life is a risk. But risks are a part of life." The court rejected Dr. Huebner's opinion that this case was "beyond high conflict," because high conflict cases are those in which "the parties simply can't resist the temptation to do anything and everything to subvert, attack, demean and literally try to destroy the child's relationship with the other parent." The court noted that the contact between the families was generally civil, that it hoped "cordial transitions can be accomplished and that cordiality may develop into friendly transitions," and that F.T.R. would have the benefit of five half siblings if Monica received placement.
¶ 25. On September 13, 2011, David filed a notice of appeal of (1) the circuit court's February 8, 2011, ruling that the PA was unenforceable, and (2) the circuit court's August 25, 2011, order granting Monica periods of physical placement. Additionally, on September 13, 2011, David filed a motion to stay the circuit court's August 25, 2011, ruling on placement pending appeal. On October 6, 2011, the court of appeals denied David's motion to stay pending appeal.
¶ 26. The parties and the guardian ad litem filed briefs in the court of appeals. On August 9, 2012, the court of appeals certified to this court the question of "whether an agreement for the traditional surrogacy and adoption of a child is enforceable." The court noted that "Wisconsin currently does not have legislative or common law that addresses the enforceability of a surrogacy agreement."
*101 ¶ 27. On September 27, 2012, we accepted the court of appeals' certification.
III. STANDARD OF REVIEW
¶ 28. The PA at issue is analyzed in terms of whether it is a valid, enforceable contract. Where the material facts are undisputed, the existence of a valid, enforceable contract is a question of law, which we review de novo. See Schlosser v. Allis-Chalmers Corp., 86 Wis. 2d 226, 244, 271 N.W.2d 879 (1978); VanHierden v. Swelstad, 2010 WI App 16, ¶ 11, 323 Wis. 2d 267, 779 N.W.2d 441.
¶ 29. As for the custody and placement issue, the circuit court typically has discretion to make a determination of what is in a child's best interests. See Wis. Stat. § 767.41(5); Jocius v. Jocius, 218 Wis. 2d 103, 110-11, 580 N.W.2d 708 (Ct. App. 1998) (quoting Koeller v. Koeller, 195 Wis. 2d 660, 663-64, 536 N.W.2d 216 (Ct. App. 1995)); Hollister v. Hollister, 173 Wis. 2d 413, 416, 496 N.W.2d 642 (Ct. App. 1992)). We will sustain the circuit court's discretionary determination unless it constitutes an erroneous exercise of discretion. Lubinski v. Lubinski, 2008 WI App 151, ¶ 5, 314 Wis. 2d 395, 761 N.W.2d 676; Bohms v. Bohms, 144 Wis. 2d 490, 496, 424 N.W.2d 408 (1988); Barstad v. Frazier, 118 Wis. 2d 549, 554, 348 N.W.2d 479 (1984). A reviewing court will sustain the circuit court's exercise of discretion if it examined the relevant facts, applied a proper standard of law, and came to a reasonable conclusion using a demonstrated and rational process. See Loy v. Bunderson, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982); Bohms, 144 Wis. 2d at 496.
*102 IV ANALYSIS
¶ 30. Aside from the termination of parental rights provisions in the PA at issue, we conclude a PA is a valid, enforceable contract unless enforcement is contrary to the best interests of the child. While the traditional defenses to the enforcement of a contract could apply, none appear to render the entire PA in this case unenforceable.[4]
¶ 31. We also conclude that the circuit court erroneously exercised its discretion by excluding the PA and rendering its custody and placement decision without consideration of the PA. We reverse the circuit court's determination that the PA is unenforceable and remand for a hearing on custody and placement, wherein the terms of the PA are enforced unless enforcement is contrary to the best interests of F.T.R.
¶ 32. Section IV A. of this opinion discusses the background of surrogacy, Section IV B. discusses whether the Wisconsin Statutes provide guidance to our analysis, Section IV C. discusses the enforceability of the PA, and Section V discusses the need for legislative action in this area.
A. Background on Surrogacy
¶ 33. Assisted reproductive technology (ART) has created ways for people to have children regardless of their reproductive capacity: "ART, in particular surrogacy arrangements, forces us to confront deeply held beliefs about what makes a 'mother' or a 'father,'... and perhaps most fundamentally, what makes a 'family.'" *103 Darra L. Hofman, "Mama's Baby, Daddy's Maybe:" A State-By-State Survey of Surrogacy Laws and Their Disparate Gender Impact, 35 Wm. Mitchell L. Rev. 449, 450 (2009).
¶ 34. In general terms, surrogacy "is the process by which a woman makes a choice to become pregnant and then carry to full term and deliver a baby who, she intends, will be raised by someone else." Thomas J. Walsh, Wisconsin's Undeveloped Surrogacy Law, Wisconsin Lawyer, Mar. 2012, at 16. See also Black's Law Dictionary 1458 (7th ed. 1999) (defining "surrogate mother" as "[a] woman who carries a child to term on behalf of another woman and then assigns her parental rights to that woman and the father"). This opinion will refer to the woman who carries the baby as the "surrogate."[5] An "intended parent" is "an individual, married or unmarried, who manifests the intent... to be legally bound as the parent of a child resulting from assisted or collaborative reproduction." American Bar Association Model Act Governing Assisted Reproductive Technology (ABA Model Act) §102(19) (Feb. 2008). The Roseckys are the intended parents of F.T.R.
¶ 35. There are two broad categories of surrogacies, traditional and gestational, but there are many permutations within those categories. In a traditional *104 surrogacy, the surrogate is the genetic mother of the child and is artificially inseminated with the sperm of the intended father or a sperm donor. See Walsh, supra, at 16. In a gestational surrogacy, the surrogate is not genetically related to the child; instead, "sperm is taken from the father (or from a donor) and an egg is taken from the mother (or from a donor), fertilization happens outside the womb (called in vitro fertilization), and the fertilized embryos are then implanted into the surrogate mother's uterus." Id. The case before the court involves a traditional surrogacy, as Monica was artificially inseminated with David's sperm.
¶ 36. Parties contemplating a surrogacy will often enter into a surrogacy agreement. Id. at 18. This agreement typically outlines the parties' rights and responsibilities throughout the surrogacy process. Common provisions include contemplated medical procedures, contingencies in case of medical complications, compensation, parental rights and responsibilities, choice of law, and the parties' intent.
¶ 37. The ability to create a family using ART has seemingly outpaced legislative responses to the legal questions it presents, especially the determination of parentage. See Mark Hansen, As Surrogacy Becomes More Popular, Legal Problems Proliferate, ABA Journal, Mar. 2011, at 54. Historically, there have been no significant questions of maternity: the woman who gave birth to a child was the child's mother. See Charles E Kindregan, Jr., Considering Mom: Maternity and the Model Act Governing Assisted Reproductive Technology, 17 Am. U. J. Gender Soc. Pol'y & L. 601, 605 (2009). Indeed, Monica is the mother of F.T.R. and has the commensurate parental rights. See Wis. Stat. § 48.02(13) (defining "parent" as "a biological parent, a *105 husband who has consented to the artificial insemination of his wife [], or a parent by adoption"). Conversely, paternity could be established in multiple ways. See, e.g., Wis. Stat. § 767.89 (paternity judgment); § 767.84(lm) (rebuttable presumption when genetic testing shows probability of paternity of 99 percent or greater); § 767.805 (voluntary acknowledgment of paternity); § 891.41 (presumption of paternity based on marriage of the parties). With surrogacy, relevant parties could include the genetic mother, genetic father, intended parents, the surrogate, and the surrogate's husband.
¶ 38. The vast majority of states do not have statutory provisions addressing surrogacy.[6] Many courts have encountered issues surrounding surrogacy, and the cases often involve ad hoc procedures attempting to effectuate the parties' intent by analyzing surrogacy issues under the state's statutes for TPR, adoption, custody and placement, and the like. See generally Rachel M. Kane, Cause of Action for Determination of Status as Legal or Natural Parents of Children Borne by Surrogate or Gestational Carrier, 48 COA 2d 687 (Jun. 2011). At oral argument, counsel for the Roseckys explained that surrogacy is a reality in Wisconsin and that Wisconsin attorneys attempt to effectuate the parties' intent in a surrogacy. Clearly, when the parties follow the agreement and everything goes as planned, the court's involvement is quite limited. For example, if the surrogate agrees to terminate her parental rights, *106 the intended parents can adopt the child. See Wis. Stat. § 48.41 (voluntary consent to TPR); Wis. Stat. § 48.82 (persons eligible to adopt a minor child); Wis. Stat. § 48.91 (if prerequisites are met, court shall grant adoption if it is in the best interests of the child). A court will often adjudicate the intended biological parent as the biological parent of a child, as David was adjudicated to be F.T.R.'s father. The adjudicated parent may then seek custody and placement of the child. Counsel for David also noted that some Wisconsin circuit courts have used Wis. Stat. § 69.14(1)(h) to make a determination of parentage for the intended mother and intended father.[7] When the parties do not agree, however, the courts are forced to confront issues of the most difficult nature.
¶ 39. Given this general background, we turn to Wisconsin law for guidance in answering whether the PA is enforceable.
B. Wisconsin Law
¶ 40. The Wisconsin Statutes do not provide a specific answer as to whether the PA is enforceable, and they do not contain a statement of public policy against enforcement.
¶ 41. One statutory provision seems to contemplate some level of relief for intended parents:
If the registrant of a birth certificate under this section is born to a surrogate mother, information *107 about the surrogate mother shall be entered on the birth certificate and the information about the father shall be omitted from the birth certificate. If a court determines parental rights over the registrant, the clerk of court shall report the court's determination to the state registrar .... Upon receipt of the report, the state registrar shall prepare and register a new birth certificate for the registrant under s. 69.15(6) and send a copy of the new certificate to the local registrar who filed the original certificate. Upon receipt of the copy, the local registrar shall destroy his or her copy of the replaced certificate and file the new certificate.
Wis. Stat. § 69.14(l)(h). "Registrant" is defined as "the subject of a certificate or declaration which a local registrar has accepted for filing in the system of vital statistics." Wis. Stat. § 69.01(19). This section seems to contemplate that a court may make a determination of parental rights to someone other than the "surrogate mother."
¶ 42. Wisconsin Stat. § 891.40 provides that if certain procedures are followed when a woman is inseminated with sperm from a sperm donor, the woman's husband at the time of conception "shall be the natural father of a child conceived." Wis. Stat. § 891.40(1). Further, the statute provides that the sperm donor "bears no liability for the support of the child and has no parental rights with regard to the child." Wis. Stat. § 891.40(2).
¶ 43. The Wisconsin Statutes also govern more typical custody and placement situations, but the statutes do not specifically contemplate the use of a surrogacy parenting agreement in the adjudication of custody and placement disputes. See Wis. Stat. ch. 767. The statutes specify that a circuit court shall make custody and placement determinations in certain enumerated *108 actions affecting the family. See Wis. Stat. § 767.41(1) (b) (annulment, divorce, legal separation, adjudicated paternity, custody, compelled support, acknowledged paternity). Surrogacy is not one of those enumerated actions. In a more typical custody and placement determination, where there is no PA, the court "shall consider all facts relevant to the best interest of the child." Wis. Stat. § 767.41(5). The statute enumerates 16 factors that the court shall consider. Id. As the circuit court noted, many of the statutory factors are difficult to apply to the facts surrounding a surrogacy:
One of the striking things to the court in this case is how many factors in § 767.41 don't apply... . The interaction of each parent has wholly been affected by [Monica's] relinquishment of the child and the orders of this court and earlier agreements of the parties. The amount and quality of time with the parent. Same analysis. The child's adjustment to home. Same analysis. The need for regularly occurring and meaningful periods of placement. So far, same analysis. In many respects it doesn't quite seem to fit into the usual analysis in family court. That is because of course this case is so unusual.
¶ 44. Adoption and termination of parental rights are also governed by the Wisconsin Statutes, but do not appear to contemplate the issues surrounding a surrogacy. Adoption is available when both of the parents are deceased, the parental rights of both parents have been terminated, the parental rights of one parent have been terminated and the stepparent seeks to adopt, or the parental rights of one parent have been terminated and the other parent is deceased. See Wis. Stat. § 48.81. Parental rights can be terminated voluntarily, see Wis. Stat. § 48.41, or involuntarily if grounds for the termi *109 nation exist. See § 48.415 (grounds include abandonment, continuing need of protection or services, continuing parental disability, and abuse). The TPR-and-adoption scheme does not provide relief for a party in Marcia's circumstance: she is the wife of the biological father, she currently has no parental rights over the child, the surrogate/egg donor refuses to voluntarily terminate her parental rights, and there are no facts in the record to indicate that there would be grounds to terminate the surrogate's parental rights.
¶ 45. Further, adoption is distinctly different than surrogacy. Adoption often occurs in circumstances where the parent cannot or will not care for the child. Substantial court oversight is necessary in a voluntary-TPR-and-adoption scenario to ensure that the biological parents have consented to the TPR after being informed of the consequences thereof. See Wis. Stat. § 48.41. In contrast, surrogacies are planned, and the intended parents want the child and are willing and able to care for the child. Additionally, the Wisconsin Statutes prohibit the proposed adoptive parents from making certain payments to the birth mother, for fear of causing undue influence or encouraging "baby-selling." See Wis. Stat. § 48.913(4). On the other hand, surrogacies may not present the same concerns for undue influence because the surrogate is often a good friend or family member of the intended parents, or, if the parties use a surrogacy agency, the surrogate is likely screened by the agency. See Hansen, supra, at 56-57 (reporting that a reputable surrogacy agency screens surrogates and "manage[s] all of the medical, psychological, legal, financial, insurance, and administrative details that go along with such an arrangement").
*110 ¶ 46. In this case, Monica was presumed to be the mother of F.T.R. because she gave birth to him, David was adjudicated as the father of F.T.R., the circuit court determined that the PA was unenforceable, and Monica is unwilling to voluntarily terminate her parental rights. Under the current statutory schemes, Marcia is left without any parental rights unless and until Monica's parental rights are terminated and Marcia adopts F.T.R.:
It is clear that the more complex surrogacy relationships do not easily fit into Wisconsin's statutory scheme. The statutes do not refer to compensation of surrogate mothers or sperm and egg donors. No provisions address the interests of the child created in this process or by in vitro fertilization. Thus, parties seeking relief in Wisconsin courts are provided no guarantee that relief can be had. Further, circuit court judges attempting to determine if relief is appropriate are given no guidance on how to apportion that relief.
Walsh, supra, at 19. Considering the facts of this case, none of the statutory schemes neatly answer the multiple legal issues presented.
¶ 47. In summary, the Wisconsin Statutes do not provide a specific answer as to whether the PA is enforceable, and they do not contain a statement of public policy against enforcement.
C. Enforceability of the PA
¶ 48. Having determined that the Wisconsin Statutes do not provide a specific answer regarding the enforceability of the PA, we turn to contract law. As such, we will analyze whether this contract satisfies the elements of a contract, and whether there are any defenses that render this contract unenforceable. First, however, we address the parties' arguments.
*111 1. Parties Arguments
¶ 49. David makes several arguments as to why the PA should be enforceable. First, David argues that the PA is enforceable under contract law and that public policy does not invalidate the PA. Indeed, David argues that public policy supports the enforcement of the PA, as it provides stability and predictability for children and for parties to surrogacies. David looks to case law and statutes from other jurisdictions that have enforced surrogacy contracts or otherwise concluded that the intended parents are the legal parents of the child. David alternatively argues that the PA should be enforced under equitable estoppel because the Roseckys relied on Monica's representations that she would be able to separate herself from the child, and they would not have gone through with the surrogacy but for those representations.
¶ 50. David further argues that the circuit court failed to consider the severability clause in the PA when addressing the TPR provisions. The circuit court framed the issue of enforceability as "whether the court can, under these circumstances, force or require the mother to terminate her parental rights." However, David argues that it is not necessary to terminate Monica's parental rights to effectuate the parties' overall intent — for the Roseckys to be the parents of F.T.R., with full custody and placement. Therefore, any offending portion of the PA can be severed, and the remaining portions can be used to enforce the parties' intent.
¶ 51. Finally, David argues that, at the very least, the PA should have been received into evidence and considered as a factor in custody and placement. David argues that the PA is relevant to several factors under Wis. Stat. § 767.41(5)(am), especially subdivision 1. *112 because the PA is evidence of the "wishes of the child's parent or parents" or is a "legal custody or physical placement proposal submitted to the court."
¶ 52. F.T.R.'s guardian ad litem on appeal, Todd J. Hepler, argues that, absent some showing of unconscionability, a surrogacy contract should be presumptively enforceable as long as it is in the best interests of the child. The guardian ad litem argues that the best way to promote stability and predictability is to presumptively enforce surrogacy agreements:
In the case of a last-minute surrogacy repudiation, once a child is born, the parties will be forced [to] instigate an immediate whirlwind of litigation concerning placement and custody of the child and the newborn's first days, weeks, months and years of life will be clouded by the atmosphere of tension, anxiety and angst incumbent with bitter litigation of this sort.
The guardian ad litem looks to the legislature's pronouncement that "instability and impermanence in family relationships are contrary to the welfare of children." Wis. Stat. § 48.01(l)(a).
¶ 53. Monica looks to a myriad of Wisconsin Statutes and cases to conclude that the PA cannot be enforceable. She argues that the PA violates Wis. Stat. § 48.913, which prohibits certain payments in an adoption, because the PA provides illegal payments to Monica and Cory. She argues that parents cannot contract to create parental rights[8] and that custody and placement agreements are not binding on the parties *113 until they are approved by a court.[9] Wis. Stat. § 767.34(1) (requiring court approval to stipulations for "legal custody and physical placement" in "an annulment, divorce, or legal separation"). Monica further argues that her refusal to follow through with the PA precludes its enforcement. See Hottenroth v. Hetsko, 2006 WI App 249, ¶ 13, 298 Wis. 2d 200, 727 N.W.2d 38 (parties to a divorce "are free to withdraw from a stipulation until it is incorporated into the divorce judgment") (internal quotation omitted). She argues that custody and placement orders cannot be "fixe[d]" such that there can be no modification of the order in the future and cannot be contingent on a future event. See Jocius, 218 Wis. 2d at 118 ("[T]he statute permitting a trial court to deny a parent physical placement does not permit the trial court to make a prospective order prohibiting a parent from requesting a change in physical placement in the future."); Culligan v. Cindric, 2003 WI App 180, ¶ 13, 266 Wis. 2d 534, 669 N.W2d 175 ("It is well settled that a circuit court lacks the statutory authority at divorce to order a change of physical placement that is both prospective and contingent on the occurrence of some anticipated event.").
¶ 54. Monica argues that the PA violates Wis. Stat. § 767.41(5)(am) because it precludes a court from considering all statutory factors in a custody and place *114 ment determination. Monica argues that enforcement of the PA violates Wis. Stat. § 767.41(4)(b), which provides that a court can preclude placement with a parent only after a hearing and after determining that the placement would "endanger the child's physical, mental or emotional health." Finally, Monica argues that blind enforcement of the PA violates the overarching principle of custody and placement determinations, that the child's best interests must dictate any agreement or order. See Wis. Stat. § 767.41(5) ("[T]he court shall consider all facts relevant to the best interest of the child.").
2. Contract Law
¶ 55. Aside from the termination of parental rights provisions, we conclude the PA is a valid, enforceable contract unless enforcement is contrary to the best interests of the F.T.R. While the traditional defenses to the enforcement of a contract apply, none have been presented to render the PA unenforceable. We do not accept David's argument that the PA is wholly enforceable. In fact, the portions of the PA calling for the termination of Monica's parental rights are unenforceable. We also do not accept Monica's assertion that the PA is wholly unenforceable. The main problem with Monica's arguments is that they are based on law that was never intended to govern the various issues presented in a surrogacy. The law does not specifically address the legal issues presented in this surrogacy dispute.
¶ 56. Despite this being a unique contract, we turn to contract law for guidance. "Wisconsin courts have long recognized the importance of freedom of contract and have endeavored to protect the right to contract." Watts *115 v. Watts, 137 Wis. 2d 506, 521, 405 N.W.2d 303 (1987). A founding principle of freedom of contract is that "individuals should have the power to govern their own affairs without governmental interference." Merten v. Nathan, 108 Wis. 2d 205, 211, 321 N.W.2d 173 (1982). Courts protect parties' "justifiable expectations and the security of transactions" by "ensuring that the promises will be performed." Id.
¶ 57. The elements of a contract are offer, acceptance, and consideration. See Goossen v. Estate of Standaert, 189 Wis. 2d 237, 247, 525 N.W.2d 314 (Ct. App. 1994); Michael B. Apfeld et al., Contract Law in Wisconsin § 2.1 (3d ed. 2012). Defenses to the enforcement of a contract include misrepresentation, mistake, illegality, unconscionability, void against public policy, duress, undue influence, and incapacity. See Apfeld et al., supra, at ch. 3.
¶ 58. Even if a contract contains an illegal provision, "Wisconsin has long accepted that a portion of a contract may be severable." Markwardt v. Zurich Am. Ins. Co., 2006 WI App 200, ¶ 30, 296 Wis. 2d 512, 724 N.W.2d 669. A severability clause, though not controlling, is entitled to great weight in determining if the remaining portions of a contract are severable. See Town of Clearfield v. Cushman, 150 Wis. 2d 10, 24, 440 N.W2d 777 (1989) (internal quotation omitted). If a contract contains an illegal clause, the remaining portions of the contract can be enforced if severing the illegal portions does not defeat the primary purpose of the bargain. See Simenstad v. Hagen, 22 Wis. 2d 653, 662, 126 N.W.2d 529 (1964); Baierl v. McTaggart, 2001 WI 107, ¶¶ 15, 18, 245 Wis. 2d 632, 629 N.W.2d 277.
*116 ¶ 59. In this case, there is no question that the PA contains the essential elements of a contract. Monica made an offer to the Roseckys that she would act as a surrogate. The Roseckys accepted Monica's offer. Consideration was provided.
¶ 60. The unique nature of this contract, however, cannot be understated.[10] Creating a child is not something that one can decide to do one day and decide not to do the next. Typical damages cannot make one whole. Nonetheless, this is a contract and we conclude that it is largely enforceable.
¶ 61. Specifically, we conclude that the interests supporting enforcement of the PA are more compelling than the interests against enforcement. Enforcement of surrogacy agreements promotes stability and permanence in family relationships because it allows the intended parents to plan for the arrival of their child, reinforces the expectations of all parties to the agreement, and reduces contentious litigation that could drag on for the first several years of the child's life.
¶ 62. We do not hold this opinion alone; the legislature has manifested its intent in the children's code, wherein it concluded that the best interests of the child are always paramount. See Wis. Stat. § 48.01. See also *117 § 767.41(5) (stating that in custody and placement determinations, the court considers "all facts relevant to the best interest of the child"); § 54.15(1) (stating that in selection of a guardian for a proposed ward, the "best interests of the proposed ward shall control"); § 938.01(2)(f) (stating that in the Juvenile Justice Code, the court considers "each juvenile's best interest" in responding to "a juvenile offender's needs for care and treatment"). Furthermore, the legislature has legislated that "instability and impermanence in family relationships are contrary to the welfare of children." Wis. Stat. § 48.01(l)(a).
¶ 63. According to the expert testimony in this case, social science research also supports the conclusion that permanency and stability promote child welfare, whereas being exposed to contentious family relationships, an inevitable consequence of litigation, is harmful. As Dr. Waldron testified: "[0]ut of over 2,000 studies that have been done... where there are separate caregivers, ... in every single one... the higher the level of tension and conflict, the more detrimental it is to kids.... [TJhat is the number one predictor for child adjustment over time, [] whether or not there's tension and conflict between caregivers." Dr. Huebner also testified that, according to research, the tension between the Roseckys and Schissels could be harmful to F.T.R.
¶ 64. We find no public policy statement contrary to the enforcement of the PA in the Wisconsin Statutes or in Wisconsin cases.[11]
*118 ¶ 65. The portions of the PA requiring Monica to terminate her parental rights, however, are not enforce able under the language of the existing statutes. The PA stated that "[t]he parties will cooperate fully in any parentage proceedings to determine [the Roseckys] as [C]hild's legal parents, or in any other similar legal proceedings, including but not limited to termination of parental rights and adoption." It further stated:
*119 The parties intend to participate voluntarily in any legal proceedings necessary to have [the Roseckys] determined to be Child's legal parents .... It is the intent of the parties that regardless of any circumstances that may arise in the future, both [Marcia] and [David] shall be the legal parents of Child. The parties agree to sign all necessary documents and attend any scheduled court hearings either prior to or after Child's birth to achieve these goals.
As the circuit court correctly noted, the portions of the PA requiring a voluntary TPR do not comply with the procedural safeguards set forth in Wis. Stat. § 48.41 because Monica would not consent to the TPR and there is no legal basis for involuntary termination. See Wis. Stat. § 48.415. As a result, the TPR provisions of the PA are unenforceable. That fact, however, does not end the analysis.
¶ 66. We further conclude that the offending TPR provisions in the PA can be severed from the remainder of the contract without defeating the primary purpose of the agreement. The PA addresses severability:
In the event any of the provisions of this Agreement are deemed to be invalid or unenforceable, such provisions will be deemed severable from the remainder of this Agreement and will not cause the invalidity or unenforceability of the remainder of this Agreement. Consistent with the provisions of this paragraph, if any provision is deemed invalid due to its scope or breadth, such provision will be deemed valid to the extent of the scope or breadth permitted by law.
Though a severability clause itself is not controlling, it is entitled to great weight in determining whether the remainder of a contract is enforceable. See Town of Clearfield, 150 Wis. 2d at 24. The primary purpose of this agreement is to ensure that the Roseckys will be *120 the parents of F.T.R. and will have custody and placement. The PA contains provisions for custody and placement: "The parties believe strongly that Child's best interests will be served by being in [the Roseckys'] legal custody and physical placement, as it is necessary for Child to regard [the Roseckys] as the sole legal parents and [the Roseckys'] home as the sole parental home." The purpose of the PA can be carried out, after severing the TPR portions, by enforcing the custody and placement provisions of the PA. See Simenstad, 22 Wis. 2d at 662.
¶ 67. As to the remaining portions of the PA, the current court record does not support any defense to the enforcement of the contract so as to render it unenforceable. There are no facts in the record to indicate, nor does Monica argue, that the contract should be void or voidable due to misrepresentation, mistake, duress, undue influence, or incapacity. See Apfeld et al., supra, ch. 3. Instead, the facts in the record appear to establish that the contract was entered into voluntarily and was well-planned, negotiated, and carefully executed. The circuit court made findings about the PA:
The contract, on its face, is clear and unambiguous. . . .
The parties are each represented by counsel, and were at the time the agreement was drawn. The agreement itself covers virtually every eventuality which could possibly occur during the pregnancy.
There is no claim here by [Monica] that she did not understand the contract when she signed it. Indeed, to a great extent, it appears it was her idea to act as a surrogate in the first instance.
Had [Monica] gone through with the termination of her parental rights, this Court would have no problem upholding the agreement....
*121 Monica offered, not once but twice, to act as a surrogate for the Roseckys. Both the Roseckys and the Schissels had independent counsel, who assisted in drafting and revising the parties' agreement. The parties negotiated the terms of the agreement. When the Roseckys raised concerns about using Monica's egg, for fear that she would not be able to separate herself from the child, Monica reassured the Roseckys that she could separate herself from the child. Monica testified that she understood all of the terms of the contract and that she simply changed her mind as to the terms.
¶ 68. Instead of arguing that the contract is void due to duress, mistake, or similar reasons, Monica argues that the PA is void as against public policy. The essence of Monica's public policy argument is that a contract cannot cut off a biological parent from his or her child, and any contract that purports to do so violates a myriad of cases and statutes relating to divorce, custody, placement, adoption, and similar areas. A contract will not be enforced if it violates public policy. Watts, 137 Wis. 2d at 521. A court may declare a contract void on public policy grounds only if it determines, after weighing the interests, that the interests in enforcing the contract are clearly outweighed by the interests in upholding the policy that the contract violates. Id.; Restatement (Second) of Contracts § 178 (1981). Public policy may be expressed by a statute, regulation, or judicial opinion. See N. States Power Co. v. Nat'l Gas Co., Inc., 2000 WI App 30, ¶ 8, 232 Wis. 2d 541, 606 N.W.2d 613. For the reasons stated above, we reject Monica's public policy arguments.
¶ 69. In summary, though the TPR portions of the PA cannot be enforced under Chapter 48 of the Wisconsin Statutes, the remainder of the PA is an enforceable *122 contract. No Wisconsin Statute or case contains a specific statement of public policy contrary to the enforcement of this PA. We conclude that enforcement of surrogacy agreements promotes stability and permanence in family relationships because it allows the intended parents to plan for the arrival of their child, reinforces the expectations of all parties to the agreement, and reduces contentious litigation that could drag on for the first several years of the child's life. Aside from the termination of parental rights provisions in the PA at issue, the PA is a valid, enforceable contract unless enforcement is contrary to the best interests of F.T.R. We turn to consider the circuit court action concerning custody and placement.
3. Application
¶ 70. The circuit court awarded primary custody and placement to David and secondary placement to Monica. It did so, however, without consideration of the PA. We conclude that the circuit court erroneously exercised its discretion by excluding the PA and rendering its custody and placement decision without consideration of the PA.
¶ 71. In custody and placement determinations, the circuit court has discretion to make a determination of what is in a child's best interests. See Wis. Stat. § 767.41(5); Jocius, 218 Wis. 2d at 110-11; Hollister, 173 Wis. 2d at 416. We will sustain the circuit court's discretionary determination unless it constitutes an erroneous exercise of discretion. See Lubinsky, 314 Wis. 2d 395, ¶ 5; Bohms, 144 Wis. 2d at 497.
¶ 72. Because we conclude that the PA is a valid, enforceable contract, the circuit court's exclusion of the PA and decision to render a custody and placement *123 order without consideration of the PA constituted an erroneous exercise of discretion.[12] Id, at 496. We therefore reverse the circuit court's order and remand for a determination of custody and placement consistent with this opinion.
V POTENTIAL LEGISLATIVE ACTION
¶ 73. We respectfully urge the legislature to consider enacting legislation regarding surrogacy.[13] Surrogacy is currently a reality in our Wisconsin court system. Legislation could "address surrogacy agreements *124 to ensure that when the surrogacy process is used, the courts and the parties understand the expectations and limitations under Wisconsin law."[14] Walsh, supra, at 56.
VI. CONCLUSION
¶ 74. Aside from the termination of parental rights provisions in the PA at issue, we conclude a PA is a valid, enforceable contract unless enforcement is contrary to the best interests of the child. While the traditional defenses to the enforcement of a contract could apply, none appear to render the entire PA in this case unenforceable.
¶ 75. We also conclude that the circuit court erroneously exercised its discretion by excluding the PA and rendering its custody and placement decision without consideration of the PA. We reverse the circuit court's determination that the PA is unenforceable and remand for a hearing on custody and placement, wherein the terms of the PA are enforced unless enforcement is contrary to the best interests of F.T.R.
By the Court. — Order reversed and cause remanded for proceedings consistent with this opinion.

 All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

 The agreement contains other provisions, including: Monica's consent to serve as a traditional surrogate; the procedure by which Monica would be inseminated; the Schissels' acknowledgement and assumption of risk; the Roseckys' acknowledgement and assumption of parental responsibility; medical supervision, counseling, and carrier conduct relating to the pregnancy; provisions for a medically-necessary abortion; Cory's waiver of rights and responsibilities; the Roseckys[1] agreement to pay enumerated expenses as a result of the pregnancy; the parties' agreement if the pregnancy were to result in a stillbirth or a miscarriage; the Schissels' agreement to maintain health insurance; contingencies if one or both of the Roseckys were to die; consequences of breach and procedures for notice; conclusive presumptions; acknowledgement of advice of counsel; severability; dispute resolution; and jurisdiction, venue, and controlling law.

 The appellate record does not contain original documents relating to the guardianship action in Columbia County. Documents in this record indicate that an order dated May 28, 2010, granted Monica two hours of placement with F.T.R. per month.

 Even though the TPR provisions in the PA are not enforceable, the remaining portions of the PA can be enforced if severing the unenforceable portion does not defeat the primary-purpose of the bargain. See Simenstad v. Hagen, 22 Wis. 2d 653, 662, 126 N.W.2d 529 (1964).

 There are several terms for the woman who carries the baby, including "surrogate," "gestational mother," or "gestational carrier." See American Bar Association Model Act Governing Assisted Reproductive Technology (ABA Model Act) § 102(16) (Feb. 2008) (defining "gestational carrier" as "an adult woman, not an intended parent, who enters into a gestational agreement to bear a child, whether or not she has any genetic relationship to the resulting child").

 Darra L. Hofman,"Mama's Baby, Daddy's Maybe:" A State-By-State Survey of Surrogacy Laws and Their Disparate Gender Impact, 35 Wm. Mitchell L. Rev. 449, 454 — 60 (2009) (state-by-state survey of surrogacy laws); Brief of Amicus Curiae American Academy of Adoption Attorneys & American Academy of Assisted Reproductive Technology Attorneys, Appendix 001-012 (same).

 In this unique case neither of the common routes that David's attorney explained provided a complete remedy for the parties because the two biological parents were contesting custody and placement. Thus, the parties instituted guardianship and custody and placement proceedings. See Wis. Stat. ch. 54; Wis. Stat. § 767.41(l)(b).

 See Sporleder v. Hermes, 162 Wis. 2d 1002, 471 N.W.2d 202 (1991), overruled by Holtzman v. Knott, 193 Wis. 2d 649, 690-91, 533 N.W.2d 419 (1995). Though the contract in Holtzman did not attempt to transfer custody, the court stated that "[n]othing in ch. 767 expressly prohibits contracts relating to visitation" and that "public policy considerations do not prohibit a court *113 from relying on its equitable powers to grant visitation apart from [sec. 767.41] on the basis of a co-parenting agreement between a biological parent and another when visitation is in a child's best interest. We overrule any language in [Sporleder] to the contrary." 193 Wis. 2d at 690-91.

 By its terms, Wis. Stat. § 767.34 is applicable only to actions for "an annulment, divorce, or legal separation." Monica argues that the requirement in § 767.34 — that a court approve the parties' stipulation as to custody and placement — is applicable to paternity actions by § 767.89(3)(b).

 The guardian ad ¡item's brief summarizes why surrogates are so unique:
[T]his case exists at the intersection of several distinct and historically different areas of law and stands at the crossroads of ever-evolving artificial reproduction technology.
The most critical fact that distinguishes this case from others is that [F.T.R.] was created so that the Roseckys could have a child of their own. This crucial fact distinguishes this case from an adoption, third-party placement, paternity or divorce case.

 To support their public policy arguments, the Roseckys, the Schissels, and the guardian ad litem point to cases and statutes from other jurisdictions. While it is true that many other jurisdictions have examined surrogacy issues, there is no clear majority rule:
*118 The vast majority of states are silent or near silent on the issues of whether, when, and how surrogacy agreements are enforceable, void, or voidable. Of those states that do have laws on the hooks regarding such agreements, the responses range from relying heavily on the Uniform Parentage Act or party intent to outright bans or even criminalization of surrogacy. In many of the states that are 'silent' on surrogacy, bills have been shot back-and-forth through the legislature but come to naught.
Hofman, supra, at 454. See also Mark Hansen, As Surrogacy Becomes More Popular, Legal Problems Proliferate, ABA Journal, Mar. 2011, at 55; Thomas J. Walsh, Wisconsin's Undeveloped Surrogacy Law, Wisconsin Lawyer, Mar. 2012, at 20. Case law in this area is similarly scattered. See, e.g., Raftopol v. Ramey, 12 A.3d 783, 793 (Conn. 2011) (concluding that Connecticut Statute, which governs birth certificates when birth is subject to a surrogacy agreement, "allows an intended parent who is a party to a valid [surrogacy] agreement to become a parent without first adopting the children, without respect to that intended parent's genetic relationship to the children" (emphasis omitted)); Johnson v. Calvert, 851 P.2d 776, 782 (Cal. 1993) (concluding that when the intended mother/egg donor and the gestational carrier had equal claims to maternity under California law, "she who intended to procreate the child — that is, she who intended to bring about the birth of a child that she intended to raise as her own — is the natural mother under California law"); Matter of Baby M., 537 A.2d 1227, 1246-50 (N.J. 1988) (concluding that enforcement of a traditional surrogacy agreement violated various statements of public policy).

 The PA contains several provisions on the custody and placement of the child:
[The Roseckys] will have physical placement of Child immediately upon Child's birth.... [The Sehissels] waive any and all claims to .. . custody, visitation, and physical placement of Child .... The parties believe strongly that Child's best interests will be served by being in [the Roseckys[1]] legal custody and physical placement, as it is necessary for Child to regard [the Roseckys] as the sole legal parents and [the Roseckys'] home as the sole parental home.
. . .It is in Child's best interests that legal custody be with [the Roseckys] immediately upon Child's birth, with no child support to be paid by [the Sehissels], that physical placement be with [the Roseckys] upon Child's release from the hospital, and that placement or visitation with [the Sehissels] be denied, as the parties agree that Child should view [the Roseckys] as the sole legal parents and [the Roseckys'] home as the sole parental home.

 Assisted reproductive technology has turned "the science of making babies into a $3 billion-a-year industry." Hansen, supra, at 54. Though reliable data is scarce on the number of surrogacies that occur every year, one account estimates that about 22,000 babies have been born using surrogacy in the United States since the mid-1970s. Id. Anecdotal evidence from attorneys practicing in this area suggests that the number may be much higher. Id. (noting a California surrogacy attorney's account that her office handles about 150 surrogacies a year).

 See, e.g., Raftopol, 12 A.3d at 801-03 (calling for legislative guidance and listing a myriad of legal issues presented by surrogacy); ABA Model Act (Feb. 2008); Uniform Parentage Act (2002); 750 111. Comp. Stat. Ann. § 47/1-47/75 (West 2012) ("Illinois Gestational Surrogacy Act").

 Matter of Baby M., 537 A.2d 1227,1249 (N.J. 1988) (citing West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937)).