IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 1, 2013 Session Heard at Murfreesboro

**IN RE BABY ET AL.**

**Appeal by Permission from the Court of Appeals, Middle Section**
**Juvenile Court for Davidson County**
**No. 20116298PT150334      Betty K. Adams Green, Judge**

**No. M2012-01040-SC-R11-JV - Filed September 18, 2014**

WILLIAM C. KOCH, JR., J., concurring.

This case of first impression regarding the enforceability of an international traditional surrogacy contract will have far-reaching ramifications both in Tennessee and beyond. While I concur, in general terms, with the Court's disposition of this particular case, I have chosen to write separately because I cannot concur with the Court's conclusion that "traditional surrogacy contracts do not violate public policy as a general rule." While the surrogate in this case may not have succeeded in demonstrating that this particular traditional surrogacy contract is unenforceable as against public policy, this case is not an appropriate vehicle for this Court to broadly declare that traditional surrogacy agreements, or any other surrogacy agreement for that matter, are consistent with Tennessee's public policy.

**I.**

The market for fertility treatment in the United States, including surrogate births, is big business.[1] This market is largely unregulated because the United States, unlike many other countries, has no national policies governing assisted reproductive technology.[2] Thus, affluent couples from Europe, Asia, and Australia, like the intended parents in this case, are

---

[1]It has been estimated that in 2004, the fertility market in the United States, including the use of surrogates, was approximately $3 billion. Debora L. Spar, *The Baby Business: How Money, Science and Politics Drive the Commerce of Conception* 3 (2006).

[2]Mark Hansen, . . . *And Baby Makes Litigation*, ABA Jour., Mar. 2011, at 52 ("Hansen"). This distinction between the United States and other countries reflects "a divide between the United States and much of the word over fundamental questions about what constitutes a family, who is considered a legal parent, who is eligible for citizenship, and whether [surrogate] child birth is a service or exploitation." Tamar Lewin, *Coming to U.S. for Baby, and a Womb to Carry It*, N.Y. Times, July 6, at A1 ("Lewin").

looking to the United States in ever-increasing numbers to find surrogate mothers for their children.[3] By some estimates, the United States is now second only to India in providing surrogate mothers. Over 1,400 babies are born in the United States each year for international parents.[4] As the Chief Justice of the Wisconsin Supreme Court recently noted, "some American states with less restrictive or no laws governing surrogacy contracts have become interstate and international medical surrogacy tourism destinations." *In re Paternity of F.T.R.*, 2013 WI 66, ¶ 95, 833 N.W.2d 634, 657 (2013) (Abrahamson, C.J., concurring).

There can be no denying that the ability to create children using assisted reproductive technology has far outdistanced the legislative responses to the myriad of legal questions that surrogacy raises. Most states do not have statutory provisions addressing these questions. *In re Paternity of F.T.R.*, 2013 WI 66, ¶¶ 37-38, 833 N.W.2d at 644. The increasing popularity of surrogacy will only cause these problems to proliferate.[5] As Chief Justice Abrahamson has noted, "the validity of surrogacy contracts . . . is at this very time being debated across the globe. Other states and nations are, at best divided over whether to enforce such contracts because of the difficult public policy questions they present." *In re Paternity of F.T.R.*, 2013 WI 66, ¶¶ 90-91, 833 N.W.2d at 656 (Abrahamson, C.J. concurring).[6] There is currently no clear majority approach to surrogacy, and, in fact, there is not even a clear plurality approach.[7]

---

[3]Lewin, *supra* n.2.

[4]Sasha N. Swoveland, Note, *Surrogacy and Insurance: The Call for Statutory Reform in Ohio*, 26 J.L. & Health 143, 164 (2013). It has been estimated that 2,000 babies will be born through surrogacy in 2014 in the United States. Lewin, *supra* n.2.

[5]Hansen, *supra* n.2, (noting that "as medical science continues to push the envelope forward, making the process of having a baby via methods other than that intended by nature accessible to all, the legal issues are multiplying." These problems will be exacerbated by the fact that the increasing costs of a surrogate birth which now range between $80,000 and $150,000 "are pushing many would-be parents . . . to try to cut corners and go the do-it-yourself route. This pro se mentality . . . most often results in surrogacy agreements that break down, frustrate the parties' intentions and wind up in court." Hansen, *supra* n.2; *see also* Lewin, *supra* n.2; Stephanie Saul, *Building a Baby, With Few Ground Rules*, N.Y. Times, Dec. 13, 2009, at A1 ("Saul").

[6]Chief Justice Abrahamson has identified four of the most significant legal and ethical issues implicit in surrogacy contracts. *In re Paternity of F.T.R.*, 2013 WI 66, ¶ 98, 833 N.W.2d at 658; *see also* Sue A. Meinke, *Surrogate Motherhood: Ethical and Legal Issues*, Nat'l Reference Ctr. for Bioethics Literature, Georgetown Univ. (1988), http://bioethics.georgetown.edu/publications/scopenotes/sn6.pdf.

[7]Paul Arshagouni, *Be Fruitful and Multiply, by Other Means if Necessary: The Time Has Come to Recognize and Enforce Gestational Surrogacy Agreements*, 61 DePaul L. Rev. 799, 800 (2012).

**II.**

Despite Tenn. Code Ann. § 36-1-102(48) (2010), Tennessee must count itself among those states that lack statutory governance of surrogacy contracts. The Court's opinion accurately recounts the background of this statute, and this background leads to only one conclusion – the Tennessee General Assembly did not intend to address the issues associated with surrogacy in any meaningful way when it enacted this statute, almost as an afterthought, in 1995.[8] Any effort to ascertain the purpose of this statute is doomed to fail because the statute itself is "almost as enigmatic as the dreams Joseph was called upon to interpret for Pharaoh."[9] Thus, were we to be candid, we would find that Tenn. Code Ann. § 36-1-102(48) sheds no light at all on the question of whether surrogacy contracts in general, or the particular surrogacy contract involved in this case, is void as against public policy.

Tennessee's public policy is reflected in its constitution, statutes, judicial decisions, and common-law rules. *State ex rel. Swann v. Pack*, 527 S.W.2d 99, 112 n.17 (Tenn. 1975) (quoting *Home Beneficial Ass'n v. White*, 180 Tenn. 585, 588, 177 S.W.2d 545, 546 (1944)). Even though this Court has stated that the articulation of the State's public policy is primarily a legislative prerogative and that our role in declaring public policy is limited, *Hodge v. Craig*, 382 S.W.3d 325, 337-38 (Tenn. 2012), the Court in this case is using Tenn. Code Ann. § 36-1-102(48) as a springboard to dive into deep public policy waters. The Court is construing the statute as an invitation to make broad public policy pronouncements regarding the viability of surrogacy contracts in Tennessee. I do not join the Court in this exercise.

The Court has chosen to support its general assertion that surrogacy contracts are valid and enforceable by treating them as contracts, nothing more, nothing less. This is a convenient choice because there can be little dispute that the freedom to contract is a vital component of personal liberty, *Dick Broadcasting Co., Inc. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 673 (Tenn. 2013) (Koch, J., concurring), and that Tennessee's public policy favors permitting otherwise competent parties to strike their own bargains. *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 435, 475-76 (Tenn. 2012). But, of course, these principles do not apply to every contract.

Unfortunately, the Court's purely contractual rationale overlooks two salient points. First, surrogacy contracts are not "standard run-of-the-mill contracts." As Chief Justice Abrahamson aptly points out "they purport to govern bodily intrusions, the use of human bodies, the creation of a child, and the custody and placement of a child once it is born." *In*

---

[8]*See* Act of May 26, 1995, ch. 532, 1995 Tenn. Pub. Acts 951.

[9]*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring).

*re Paternity of F.T.R.*, 2013 WI 66, ¶ ¶ 81-82, 833 N.W.2d at 654 (Abrahamson, C.J. concurring). Second, as more than amply illustrated by this case, "surrogacy agreements that go badly have profound implications, particularly for the children."[10]

## III.

Surrogacy is currently a reality in Tennessee. The number of surrogacy agreements in Tennessee will surely increase as persons who are unable to have children on their own resort more frequently to various assisted reproductive technologies, including surrogacy. At present, Tenn. Code Ann. § 36-1-102(48) provides no helpful guidance to prospective surrogate mothers and intended parents or to the bench and the bar when they confront the numerous and complicated questions and issues that surrogacy triggers. The legal rules governing this area are ambiguous, if not non-existent, and they need to be clarified. Until they are, surrogacy contracts in Tennessee will be in legal limbo.[11]

The question we must address in this case is which branch of government is best suited for the task of defining and clarifying the legal framework for surrogacy agreements in Tennessee. While the desire to bring some order to the ambiguity is commendable, the case-by-case approach the courts must use is less effective in circumstances like this than the far more dynamic ability of the General Assembly to address important public policy issues. This is a case where the Court would be well-served to leave the articulation of Tennessee's acceptance or rejection of surrogacy contracts as a matter of public policy to the General Assembly.[12]

For these reasons, I would take a far narrower approach to reach the same result reached by the Court. Rather than broadly stating that "traditional surrogacy contracts do not violate public policy as a general rule," I would find that the surrogacy agreement in this case

---

[10]Saul, *supra* n.5.

[11]Hansen, *supra* n.2; Saul, *supra* n.5.

[12]It is true that the Tennessee General Assembly has let these important issues lie fallow for almost twenty years and that legislatures in other states have themselves been slow to address these issues, despite the courts' requests that they do so. *See In re Paternity of F.T.R.*, 833 N.W.2d at 653; *Raftpol v. Rainey*, 12 A.3d 783, 801-03 (Conn. 2011). However, the courts' response to legislative inaction, whether inadvertent or intentional, should always be tempered by the admonition in Article II, Section 2 of the Constitution of Tennessee that persons belonging to one branch of government should avoid exercising the powers properly belonging to the other branches. The better course at this juncture would be accredit the presumption, albeit rebuttable, that the members of the General Assembly, like other public officials, will discharge their duties in good faith. *See State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 775 (Tenn. Ct. App. 2001).

is enforceable, except to the extent, as found by the Court, that it is inconsistent with the statutes explicitly governing the termination of parental rights and the care and custody of children born out of wedlock. The broader public policy questions should be left to the General Assembly.[13]


_____
WILLIAM C. KOCH, JR., JUSTICE

---

[13]In fact, the Court's broad holding in this case may very well complicate the General Assembly's ability to address many of the difficult legal and ethical issues that surrogacy raises. One might wonder whether the General Assembly can now decide, notwithstanding the Court's decision, that some types of surrogacy or some components of surrogacy agreements are not consistent with Tennessee's public policy. The inevitable litigation over that question must wait for another day.