# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### March 10, 2015 Session

## IN RE: AMADI A., ET AL.

### Direct Appeal from the Juvenile Court for Madison County
### No. 5548824     Christy R. Little, Judge

### No. W2014-01281-COA-R3-JV – Filed April 24, 2015

This case involves a dispute over legal maternity of twin children born as the result of a surrogacy agreement. The intended parents of the children filed a joint petition, along with the surrogate mother and her husband, asking the juvenile court to declare the intended parents as the legal parents of the children and to require the Tennessee Department of Health to list them as the parents on the children's birth certificates. The trial court initially granted the requested relief, but upon consideration of a motion to alter or amend filed by the Department of Health, the trial court ruled that the surrogate mother was the legal mother of the children and the party to be listed on the birth certificates. The intended parents, the surrogate, and her husband appeal. We affirm in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in part, Vacated in Part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, J. and KENNY ARMSTRONG, J., joined.

Bede O. M. Anyanwu, Jackson, Tennessee, for the appellants, B.O.A., A.D.J.A., C.S.B. and T.B.

Herbert H. Slatery, III, Attorney General and Reporter, Andree S. Blumstein, Solicitor General, and Sara E. Sedwick, Senior Counsel, Nashville, Tennessee, for the appellee, Tennessee Department of Health.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Mr. and Mrs. A[1] entered into a surrogacy contract with C.S.B. (hereinafter "C.B.") and her husband T.B., whereby C.B. would serve as the gestational carrier of a child or children for Mr. and Mrs. A. Donated eggs were fertilized with Mr. A's sperm, and the resulting embryos were implanted in C.B.'s womb. The procedure was successful, and C.B. gave birth to twin boys on April 2, 2014.

On April 3, 2014, Mr. and Mrs. A filed a joint petition along with C.B. and T.B. in the Juvenile Court of Madison County. The petition was styled, "Petition to Establish Parentage and Custody, to Ratify Gestational Carrier Agreement and for Declaratory Judgment." The petition was brought pursuant to Tennessee Code Annotated section 36-2-301, et seq., which, by its terms, provides "a single cause of action to establish parentage of children other than establishment by adoption . . . or by acknowledgement of parentage," and pursuant to Tennessee's Declaratory Judgment Act, Tennessee Code Annotated section 29-14-101, et seq. The joint petition stated that Mr. A was the "intended and genetic father" of the children and that Mrs. A was the "intended mother." It also stated that C.B. was the gestational carrier of the children but not a biological parent or genetic donor. According to the petition, the egg donor for the procedure had no legal right to the egg and no right to act as a parent to any child born of the procedure. The parties attached to the joint petition the gestational carrier agreement they executed in connection with the procedure. The parties' joint petition asked the court to declare Mr. and Mrs. A as "the legal parents of the child[ren] at birth and vest in them all rights and responsibilities of parenthood under the Laws of Tennessee," including the right to make medical decisions for the children and the right to have their names entered on the children's birth certificates as their parents. According to the petition, C.B. and T.B. joined the petition in order to give their consent for legal parentage to be established in Mr. and Mrs. A. To that end, C.B. and T.B. requested that their legal rights to the children, if any, be terminated. In sum, the joint petition asked the court to declare Mr. and Mrs. A as the sole legal parents of the children, to declare that C.B. and T.B. were not the children's parents, and to enter an order requiring the Tennessee Department of Health (hereinafter "Department") to issue birth certificates for the children reflecting Mr. and Mrs. A as the children's parents.

That same day, a general sessions judge sitting by interchange entered an ex parte order granting the relief sought in the joint petition. The order, which appears to have been prepared by the petitioners' counsel, declared the parentage of the children pursuant

---

[1]The trial court ruled that the parties to this case would be referenced by their initials. We have also used this practice in order to protect the anonymity of the parties and the children at issue.

to Tennessee Code Annotated section 36-2-301, et seq.  It provided that Mr. and Mrs. A had "the sole right to physical and legal custody of the children pursuant to the Agreement, the parties' intent, and by Order of this Court."  The order stated that C.B. was not the biological mother and "not the mother of the children pursuant to any definition found in statute or law."  The order further stated that C.B. and T.B. waived any legal rights and responsibilities they could have had with regard to the children, and therefore, their rights, "if they had any," were "forever terminated."  Mr. and Mrs. A were declared the sole legal parents of the children, and the court ordered the Department of Health to issue original birth certificates reflecting Mr. and Mrs. A as the sole legal father and mother of the children immediately upon birth.

On May 6, 2014, the Tennessee Department of Health filed a motion to intervene and to alter or amend or set aside "pertinent portions" of the court's order.  Specifically, the Department asked the court to set aside those portions of the order finding that Mrs. A, the "non-genetic, non-gestational intended mother," was the legal mother of the children and entitled to have her name listed on the original birth certificates.  Because Mrs. A had no biological or gestational relationship with the children, the Department claimed that placing her name on the children's birth certificates was contrary to state law.  As support for this assertion, the Department cited the definition of "live birth" listed in Tennessee Code Annotated section 68-3-102(10) of the Vital Records Act, which refers to a product of human conception being extracted "from its mother."  Thus, the Department claimed that it was appropriate to list the woman who gave birth, C.B., on the birth certificates, along with the children's biological father, Mr. A.[2]  The Department asserted that it would list a non-biological and non-gestational intended mother, such as Mrs. A, only on certificates of birth by adoption if the Department received the necessary paperwork following an adoption proceeding.

The joint petitioners filed a motion to quash the motion filed by the Department of Health.  After a hearing, the juvenile court judge entered an order granting the Department's motion to intervene and to alter or amend or set aside the previous order.  The court found that the previous order directing the Department to list Mrs. A as the children's mother on the birth certificates would violate the Vital Records Act, noting the aforementioned definition of "live birth."  Accordingly, the court concluded that the woman who gave birth to the children must be listed as the mother on the original birth certificates.  The court also found that a nonbiological parent must adopt in order to

---

[2]The Department noted that under ordinary circumstances, a married woman's husband (such as T.B.) is rebuttably presumed to be the father of a child pursuant to Tennessee Code Annotated sections 36-2-304(a)(1) and 68-3-305(a)(1).  However, because the court's previous order found Mr. A to be the biological father, the Department considered this to be a finding of paternity in accordance with section 68-3-305(c) and agreed to place Mr. A's name on the birth certificates.  This decision is not challenged on appeal.

obtain parental rights, citing Tennessee Code Annotated section 36-1-102(48), which governs certain types of surrogacy arrangements. Consequently, the court also vacated those portions of its previous order that purported to vest parental rights in Mrs. A. The joint petitioners timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

Mr. and Mrs. A, C.B., and T.B. present the following issues for review on appeal:

1.      Whether the juvenile court erred in vacating portions of its prior order granting Mrs. A legal rights as parent of the children born as a result of the gestational carrier agreement;

2.      Whether the terms of the gestational contract agreement must be followed;

3.      Whether equal protection requires that Mrs. A have the same right to be recognized as the legal parent of her child conceived by a donated egg as her husband would have if he had used donated sperm for the twins' conception;

4.      Whether Mr. and Mrs. A have a constitutionally protected liberty interest in their family life such that denying them legal recognition of their relationship with the children violates their due process rights.

For the following reasons, we affirm in part, vacate in part, and remand the decision of the juvenile court for further proceedings.

## III. DISCUSSION

First, we note that the petitioners raised arguments on appeal regarding equal protection and due process. However, these issues were not raised before the trial court. A party may not raise an issue for the first time on appeal. *In re Estate of Smallman*, 398 S.W.3d 134, 148 (Tenn. 2013); *see also Welch v. Bd. of Prof'l Responsibility*, 193 S.W.3d 457, 465 (Tenn. 2006) ("It has long been the general rule that questions not raised in the trial court will not be entertained on appeal.") Petitioners waived their constitutional arguments by failing to raise them in the trial court. *See In re Estate of Smallman*, 398 S.W.3d at 148. Accordingly, we do not consider them on appeal.

At the outset, it is important to note some basic terms applicable to surrogacy arrangements and to emphasize the precise type of surrogacy that is at issue in this case.

4

"Surrogacy is generally defined as '[t]he process of carrying and delivering a child for another person.'" *In re Baby*, 447 S.W.3d 807, 818 (Tenn. 2014) (quoting *Black's Law Dictionary* 1582 (9th ed. 2009)). Surrogacy arrangements generally fall into two broad categories: traditional surrogacy and gestational surrogacy. *Id.* In a traditional surrogacy arrangement, a surrogate mother gives birth to a child by allowing her own eggs to be fertilized by artificial insemination. *Id*; *see also In re C.K.G.*, 173 S.W.3d 714, 720 (Tenn. 2005). A traditional surrogate mother thus has a genetic connection to the child whom she carries and bears on behalf of others. *In re C.K.G.*, 173 S.W.3d at 720. By contrast, in a gestational surrogacy arrangement, "'one woman (the genetic mother) provides the egg, which is fertilized, and another woman (the surrogate mother) carries the fetus and gives birth to the child.'" *In re Baby*, 447 S.W.3d at 818 (quoting *Black's Law Dictionary* 1582 (9th ed. 2009)). "The key distinction is that a traditional surrogate is the biological mother of the child, whereas a gestational surrogate has no genetic relation to the child." *Id.* at 818-19 (citing *In re C.K.G.*, 173 S.W.3d at 720).

The term "intended parent" in the context of surrogacy law means an individual "'who manifests the intent . . . to be legally bound as the parent of a child resulting from assisted or collaborative reproduction.'" *In re Baby*, 447 S.W.3d at 813 n.3 (quoting *In re F.T.R.*, 349 Wis.2d 84, 833 N.W.2d 634, 643 (2013)). In a traditional surrogacy, the intended mother does not give birth to the child and has no genetic relation to the child. *Id.* at 819. In a gestational surrogacy, the intended mother does not give birth to the child but may in fact be the biological mother. *Id.* However, that is not always the case. In a "gestational surrogacy with egg donation," a gestational carrier "carries and gives birth to a child as a result of fertilization and implantation of a third-party donor's egg." *In re C.K.G.*, 173 S.W.3d at 720. Under those circumstances, the intended mother has no genetic relation to the child, and neither does the gestational carrier.

The case before us involves a gestational surrogacy with egg donation. Surrogacy arrangements have only been reviewed in a handful of Tennessee cases. However, the Middle Section of this Court recently considered one of the precise issues we are asked to decide -- who should be listed as the mother on the birth certificate of a child born of a surrogate mother from an anonymously donated egg and the intended father's sperm. The facts of *In re Adoption of A.F.C.*, No. M2013-00583-COA-R3-CV, 2014 WL 3540670 (Tenn. Ct. App. July 16, 2014), *perm. app. denied* (Tenn. Nov. 20, 2014), are strikingly similar to those in this case. Intended parents entered into a surrogacy agreement with another couple. *Id.* at *1. Per the agreement, the intended parents obtained an egg from an anonymous donor and had the egg fertilized in vitro with the intended father's sperm and implanted in the surrogate's uterus. *Id.* One day before the child's birth, the intended parents filed a petition for declaration of parentage, seeking a ruling that the surrogate mother was not the genetic or legal mother and should not be listed on the child's birth certificate. *Id.* The trial court granted the requested relief, but

subsequently, the Department of Health filed a motion to intervene and to alter or amend or set aside the order. *Id.* As in this case, the Department claimed that the surrogate's name should be listed on the birth certificate and that the intended mother could only be listed on a new birth certificate obtained after an adoption. *Id.* The trial court only partially granted the Department's motion, modifying the portion of its order addressing the birth certificate and deciding that the surrogate mother must be listed as the mother on the birth certificate, but leaving intact its ruling that the intended mother was the "legal mother" of the child. *Id.* at \*2. On appeal, the Department of Health did not challenge the trial court's designation of the child's legal mother; the Department simply questioned who should be listed on the birth certificate. *Id.* at \*3. The intended parents framed the issue on appeal broadly, asking the court to decide "Who is the legal mother of a child conceived with an anonymously donated egg and carried by a gestational carrier for the benefit of the child's genetic father and his wife who arranged for the child and conceived him with the intention to be his parents?" *Id.* at \*2. The court of appeals explained that "[t]he determination of who should be listed as the mother on the birth certificate is independent of the determination of who is the 'legal mother.'" *Id.* at \*3. Although a birth certificate provides "'prima facie evidence of the facts stated,'" pursuant to Tenn. Code Ann. § 68-3-202, the names listed on the birth certificate "are not a finding of parentage nor do they create or terminate parental rights." *Id.* For example, a voluntary acknowledgment of paternity executed by a father pursuant to Tennessee Code Annotated section 24-7-113 constitutes a "legal finding of paternity" that enables his name to be listed on the birth certificate. *Id.* at \*3 n.2. However, "it is the voluntary acknowledgment of paternity that is legally operable, not the child's birth certificate." *Id.* Because the Department did not appeal the trial court's ruling that the intended mother was the child's legal mother, the court of appeals found that particular issue inappropriate for resolution and limited the scope of its review to who should be listed on the child's birth certificate. *Id.* The court noted that we must decide cases involving such important legal and policy concerns on "particularly narrow grounds given their inherently policy-laden and administratively and fiscally momentous nature." *Id.* at \*2 (quotation omitted). Therefore, the "important and consequential issue" of designating the child's legal mother, the court said, "should be left for determination in a case that presents an actual, ongoing controversy, or . . . should be resolved by the legislature." *Id.* at \*3.

The court of appeals did resolve the question as to "who should be listed as the child's mother on the certificate of live birth" – the intended mother, the surrogate mother, or the unknown egg donor. *Id.* at \*4. The court noted that the Department of Health is charged with the responsibility of maintaining vital records and collecting information that will "'aid the public health of the state.'" *Id.* (citing Tenn. Code Ann. § 68-3-201). The vital records must include, at a minimum, "'the items recommended by the federal agency responsible for national vital statistics.'" *Id.* (quoting Tenn. Code Ann. § 68-3-202(a)). In that regard, the National Center for Health Statistics has

6

promulgated a standard certificate of live birth that includes the names of the parents and child and detailed medical information regarding the mother's pregnancy, including information regarding her prenatal care, health information, whether she received food assistance, her number of previous births, pregnancies, and the outcomes of those events. *Id.* at *4-5. The form also includes detailed information about the labor and birth itself, obstetric procedures, infections during the pregnancy, and maternal morbidity. *Id.* at *5. "The guide to completing the birth certificate advises that '[a]ll information on the mother should be for the woman who gave birth to, or delivered the infant.'" *Id.* Considering the intent of and purpose served by the Vital Records Act and the relevant federal law, the court of appeals determined that "the 'mother' to be entered on the certificate of live birth required by Tenn. Code Ann. § 68-3-301 is the same as that used in preparing the standard certificate, i.e., the woman who delivers the child." *Id.* The court noted that its conclusion was also consistent with the definition of "live birth" found in the Vital Records Act, which references the expulsion or extraction of a product of human conception "from its mother." *Id.* (quoting Tenn. Code Ann. § 68-3-102(10)). Accordingly, the court of appeals held that the surrogate mother should be listed on the child's birth certificate as the mother.

We agree with the court's reasoning in *In re Adoption of A.F.C.* and likewise hold that the surrogate mother in this case, C.B., should be listed on the birth certificates for the children. The juvenile court's ruling in that regard is affirmed.

Aside from this issue, the parties also ask us to declare that Mrs. A is the legal mother of the children, not C.B. The original order entered in this case stated that Mr. and Mrs. A were the sole legal parents of the children. Upon consideration of the Department's motion to alter or amend or set aside, the juvenile court vacated those portions of its order that purported to vest parental rights in Mrs. A and ruled that Mrs. A, as a nonbiological parent, could only obtain parental rights through an adoption. Mr. and Mrs. A challenge this ruling on appeal.

Even though Tennessee courts have only considered a few surrogacy cases, the Tennessee Supreme Court has decided two important cases involving the legal rights of parties involved in surrogacies. In *In re C.K.G.*, 173 S.W.3d 714 (Tenn. 2005), the supreme court considered the issue of maternity where the gestational carrier of triplets obtained the eggs from an anonymous third-party donor. In *In re Baby*, 447 S.W.3d 807 (Tenn. 2014), the court considered a dispute between intended parents and a traditional surrogate mother (i.e., the biological mother). The surrogacy in this case more closely resembles the one at issue in *In re C.K.G.*, so we will begin by reviewing the court's decision therein.

*In re C.K.G.* involved an unmarried couple, Charles and Cindy, who desired to

have children when they were in their forties and sought assistance at a fertility clinic. *In Re: C.K.G.,* 173 S.W.3d at 717. Anonymously donated eggs were fertilized with Charles's sperm and implanted in Cindy's uterus. *Id.* at 718. As a result, Cindy gave birth to triplets. After the relationship between Charles and Cindy deteriorated, Charles sought custody of the three children on the basis that Cindy lacked a genetic connection to the children and failed to qualify as their mother under Tennessee domestic relations statutes. *Id.* at 718-19. At the outset, the supreme court noted that the issue before it was "distinct from other kinds of maternity disputes" and "distinguishable from maternity disputes within the context of 'traditional surrogacy.'" *Id.* at 720. The court emphasized that a traditional surrogate mother has a genetic connection to the child, while a gestational surrogacy involves a genetically-unrelated surrogate mother. *Id.* As for who qualifies as the child's mother, the court found little guidance in Tennessee statutes. It explained that "recent developments in reproductive technology have caused a tectonic shift in the realities which underlie our legal conceptions of parenthood." *Id.* at 721. The "technological fragmentation of the procreative process," with techniques for egg and sperm donation, have "engendered a bewildering variety of possibilities which are not easily reconciled with our traditional definitions of 'mother,' 'father,' and 'parent.'" *Id.* For example, the court noted, the range of parties claiming to be parents could now potentially include "'a sperm donor, an egg donor, a surrogate or gestational host, and two nonbiologically related individuals who intend to raise the child.'" *Id.* (quoting John Lawrence Hill, *What Does It Mean to Be a "Parent"? The Claims of Biology as the Basis for Parental Rights*, 66 N.Y.U. L.Rev. 353, 355 (1991)). The court found that "Tennessee's parentage and related statutes do not contemplate many of the scenarios now made possible by recent developments in reproductive technology." *Id.* After reviewing the applicable statutes, the court concluded that Cindy's situation fell "outside the statutory scope of the parentage and adoption statutes, which do not expressly control the circumstances of this case." *Id.* at 722-23. The court decided that Tennessee's parentage statutes simply failed to contemplate a dispute over maternity and "were not designed to control questions of parentage where sperm or egg donation is involved." *Id.* at 724. In fact, the court found no indication that the Tennessee General Assembly "even sought to decide questions of maternity at all." *Id.* at 729.

The court recognized that the adoption chapter of the Tennessee Code does contain a definition defining "surrogate birth" as follows:

(48)(A) "Surrogate birth" means:

> (i) The union of the wife's egg and the husband's sperm, which are then placed in another woman, who carries the fetus to term and who, pursuant to a contract, then relinquishes all parental rights to the child to the biological

parents pursuant to the terms of the contract; or

(ii) The insemination of a woman by the sperm of a man under a contract by which the parties state their intent that the woman who carries the fetus shall relinquish the child to the biological father and the biological father's wife to parent;

(B) No surrender pursuant to this part is necessary to terminate any parental rights of the woman who carried the child to term under the circumstances described in this subdivision (48) and no adoption of the child by the biological parent or parents is necessary;

(C) Nothing in this subdivision (48) shall be construed to expressly authorize the surrogate birth process in Tennessee unless otherwise approved by the courts or the general assembly.

Tenn. Code Ann. § 36-1-102(48). However, that definition, passed in the mid-1990s, assumed the existence of a marital relationship between the intended parents, the execution of a surrogacy contract, and that the intended mother would be a woman other than the gestator. *In re C.K.G.*, 173 S.W.3d at 723. As a result, the surrogate birth statute did not control the circumstances of Cindy's case either.

In the absence of any applicable legislation, the court considered caselaw from other jurisdictions that had considered the parental status of a gestational carrier implanted with donated eggs. *Id.* at 724. Some courts focused on intent, holding that the intended mother was the legal mother, while other courts focused on genetics and/or gestation, holding the genetic connection to be of paramount importance. *Id.* at 725. The supreme court determined that both of these tests suffered from inadequacies. *Id.* at 726. The court found that the intent test was unnecessarily broad as to whom it could afford maternal status. *Id.* It noted that the intent test had been criticized for discarding "both genetics and birth as the primary means of identifying the natural maternal parent" and creating, "in effect, a private adoption process that is readily subject to all the defects and pressures of such a process." *Id.* (quotation omitted). The court added that, "[i]n Tennessee, unlicensed and unregulated adoption is statutorily prohibited and subject to criminal penalties." *Id.* (citing Tenn. Code Ann. §§ 36-1-108 to -109 (2001)).

On the other hand, the court also found that the genetic test had "significantly broad implications" and "inadequacies." *Id.* The supreme court noted that one of the "practical effects" of the genetic test is that it falls at the other end of the spectrum and results in an "'adoption-default model.'" *Id.* (quoting *In re Marriage of Buzzanca*, 61 Cal.App.4th 1410, 1423, 72 Cal.Rptr.2d 280, 289 (Cal. App. 4 Dist. 1998)).

The idea is that by not specifically addressing some permutation of artificial reproduction, the Legislature has, in effect, set the default switch

on adoption. The underlying theory seems to be that when intended parents resort to artificial reproduction without biological tie the Legislature wanted them to be *screened* first through the adoption system.

*In re Marriage of Buzzanca,* 61 Cal.App.4th at 1423. Thus, under the genetic test, "an intended 'mother' who employs techniques for assisted reproduction including egg donation would by default have to submit to government-controlled adoption procedures to attain a secure legal status as 'mother.'" *In re C.K.G.*, 173 S.W.3d at 726. Our supreme court observed that, "[p]olicy-wise, the requirement of such regulation may or may not be sound." *Id.* A purely genetic test could also produce troublesome results. If a dispute arises between an intended mother who obtained eggs from a third-party donor and the gestational surrogate in whom the eggs were implanted, "the genetic test would implicitly invalidate any surrogacy agreement." *Id.* Under circumstances where the genetic mother is an anonymous egg donor, a genetic test "would result in the absurdity of children having, for all practical purposes, no legal mother." *Id.* at 729. Accordingly, the court decided that "'a genetic test cannot be the only basis for determining who will assume the status of legal parent.'" *Id.* (quoting *Belsito v. Clark*, 67 Ohio Misc.2d 54, 644 N.E.2d 760, 767 (1994)).

The supreme court ultimately declined to adopt either the genetic test or the intent test "as a general rule" for resolving the issue of maternity. *Id.* at 726. Given the "inherently policy-laden and both administratively and fiscally momentous" nature of the broad issues implicated by surrogacy arrangements, the court decided to resolve the case before it on "particularly narrow grounds" and "focus closely on its particular facts." *Id.* at 726-27. The court listed four factors that it found to be "relevant" and "significant" for deciding the case. *Id.* at 727.

First, the court described genetics as "an important factor in establishing legal maternity." *Id.* Human reproduction cannot take place without genetic material, and emphasizing genetics in the analysis "recognizes and honors an individual's decision to procreate or refrain from procreating." *Id.* The court explained that "genetics remains an irreplaceable component of human reproduction, and as such genetic consanguinity is and should be particularly important to parentage determinations." *Id.* at 729. However, the court cautioned that in cases like Cindy's, "where a woman has become intimately involved in the procreation process even though she has not contributed genetic material, factors other than genetics take on special significance." *Id.* at 727-28.

The second factor the court deemed significant is "the intent to take on both parental rights and responsibilities." *Id.* at 728. The court found that Tennessee's artificial insemination statute supported the consideration of intent as a factor, as it provided that a child born to a married woman as a result of artificial insemination, with

consent of her husband, was deemed to be the legitimate child of the husband and wife. *Id.* (citing Tenn. Code Ann. § 68-3-306). By conferring parental status on a husband even though the child conceived in his wife via artificial insemination was not necessarily genetically related to him, the court found that the artificial insemination statute reflected "a policy which favors taking into account intent in establishing parentage when technological assistance is involved." *Id.*

Third, the court found it appropriate to consider gestation as a factor in its analysis. Historically, gestation had proven genetic parentage beyond doubt and was conclusive of maternity. *Id.* Because the common law presumed the birth mother to be the legal mother, the court considered gestation to be "another important factor in determining legal maternity in this case." *Id.* at 729. The court also said that "sound policy and common sense favor recognizing gestation as an important factor for establishing legal maternity." *Id.* Even though technology now allows the separation of genetic and gestational contributions, the court said, "'it does not follow that gestation is now a less important part of parenthood.'" *Id.* (quoting Malina Coleman, *Gestation, Intent, and the Seed: Defining Motherhood in the Era of Assisted Human Reproduction* 17 Cardozo L.Rev. 497, 517 (1996)).

The final factor considered by the supreme court was "the nature of the controversy." *Id.* at 730. The court emphasized that it was not faced with a dispute between a genetic mother and a gestational carrier. In Cindy's case, the genetic mother was an anonymous egg donor. The court also reiterated that the case did not involve a controversy between a traditional or gestational surrogate mother and a genetically-unrelated intended mother who wished to raise the child as her own. Again, in Cindy's case, she was the only "mother" involved. The sole dispute was between Cindy, as the gestational carrier and intended mother, and her former partner, the triplets' biological father, Charles. The court expressly noted that the "other kinds of conflicts" that could potentially arise between parties to surrogacy agreements would "present different questions and ones which would be inappropriate for us to decide here." *Id.* Accordingly the court limited its holding "to cases where there is no controversy between the gestator and the genetic 'mother.'" *Id.*

Applying the four factors mentioned above – genetics, gestation, intent to take on parental responsibilities, and the nature of the controversy -- the court concluded that Cindy was the legal mother of the triplets. *Id.* She and her husband demonstrated a bona fide intent that Cindy would be the legal mother prior to the children's birth. *Id.* She carried the triplets as the gestational carrier and gave birth to them. *Id.* And finally, the case did not involve a controversy between a gestational carrier and a genetic mother, nor did it involve a dispute between a surrogate mother and a genetically unrelated intended mother. *Id.* Therefore, even though Cindy lacked a genetic connection to the children,

the court concluded that the factors supported designating her as the legal mother. *Id.* In closing, however, the court invited legislative action to address the complicated issues involved in surrogacy cases: "given the far-reaching, profoundly complex, and competing public policy considerations necessarily implicated by the present controversy, crafting a broadly applicable rule for the establishment of maternity where techniques for assisted human reproduction are involved is more appropriately addressed by the Tennessee General Assembly." *Id.* at 733.

Unfortunately, the Tennessee General Assembly has not taken action to address these complicated issues since the court's decision in *In re C.K.G.* The Tennessee Supreme Court recently considered another surrogacy case in *In re Baby*, 447 S.W.3d 807 (Tenn. 2014). However, that case involved a *traditional* surrogacy agreement and a dispute between the intended parents and the surrogate/biological mother. In *In re Baby*, the court noted its previous consideration of "gestational surrogacy with egg donation" in *In re C.K.G.* but explained that the multi-factor test it had developed for determining the maternal rights of the gestational surrogate was inapplicable to a dispute between a traditional surrogate and intended parents. *In re Baby*, 448 S.W.3d at 822 n.9. Instead, the definition of surrogate birth provided by section 36-1-102(48)(A)(ii) applied.

Again, the case before us involves gestational surrogacy with egg donation, like the arrangement in *In re C.K.G.* The intended parents and the surrogate mother jointly filed a "Petition to Establish Parentage and Custody, to Ratify Gestational Carrier Agreement and for Declaratory Judgment." Because the parentage statutes "were not designed to control questions of parentage where sperm or egg donation is involved," *In re C.K.G.*, 173 S.W.3d at 724, the parentage statutes do not entitle the petitioners to relief.[3] The petitioners also sought relief pursuant to the Declaratory Judgment Act. On appeal, they ask this Court to apply the multi-factor test formulated in *In re C.K.G.* and declare Mrs. A as the legal mother of the children. However, we find a declaratory judgment inappropriate under the facts of this case due to the absence of a justiciable controversy.

---

[3]On appeal, the Department of Health claims it is "clear" based on the court's decision in *In re Baby* that an intended mother must adopt in order to attain status as a legal mother. However, *In re Baby* involved a traditional surrogacy arrangement involving a biological surrogate mother, and the court concluded that "the enforcement of a traditional surrogacy contract must occur within the confines of the statutes governing who qualifies as a legal parent." *In re Baby*, 447 S.W.3d at 830. The court stated that Tennessee's "*adoption code* provides that a woman may qualify as the '[l]egal parent' of a child in two ways: (1) by being '[t]he biological mother of a child,' Tenn. Code Ann. § 36–1–102(28)(A); or (2) by being '[a]n adoptive parent of a child,' *id.* § 36–1–102(28)(E)." *Id.* at 829 (emphasis added). However, the court added a footnote clarifying that it had "recognized a limited exception to these definitions" for the intended mother who used donated eggs in *In re C.K.G.* because "the adoption statutes did not apply in the specific circumstances of that case." *Id.* at 829 n.13. We likewise find the parentage and adoption statutes inapplicable to this case, involving gestational surrogacy with egg donation.

Tennessee's Declaratory Judgment Act gives courts "the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Tenn. Code Ann. § 29-14-102(a). A party "interested under a . . . written contract . . . or whose rights, status, or other legal relations are affected by a . . . contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status or other legal relations thereunder." Tenn. Code Ann. § 29-14-103. However, "the expansive powers found in the statute may only be exercised in those situations where the parties can demonstrate the existence of a justiciable controversy." *Oldham v. American Civil Liberties Union Foundation of Tennessee, Inc.*, 910 S.W.2d 431, 433-34 (Tenn. Ct. App. 1995). "A proceeding qualifies as a 'legal controversy' when the disputed issue is real and existing, and not theoretical or abstract, and when the dispute is between parties with real and adverse interests." *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam County*, 301 S.W.3d 196, 203 (Tenn. 2009) (internal citations omitted). A party seeking a declaratory judgment need not show a present injury, but the party nonetheless has the burden of demonstrating that an actual "case" or "controversy" exists. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 838 (Tenn. 2008). In other words, there must be a "bona fide disagreement." *Id.* The party seeking a declaratory judgment must allege facts showing that he or she "is seeking to vindicate an existing right under presently existing facts." *Burkett v. Ashley*, 535 S.W.2d 332, 333 (Tenn. 1976). The Declaratory Judgment Act "gives the court no power to determine future rights or possible controversies in anticipation of events that may not occur." *West v. Carr*, 370 S.W.2d 469, 475 (Tenn. 1963). It does not allow the courts "'to render advisory opinions to assist the parties or to allay their fears as to what may occur in the future.'" *Morrow v. SunTrust Bank*, No. W2010-01547-COA-R3-CV, 2011 WL 334507, at *6 (Tenn. Ct. App. Jan. 31, 2011) (quoting *Parks v. Alexander*, 608 S.W.2d 881, 892 (Tenn. Ct. App. 1980)). In order for the equitable remedy of declaratory judgment to lie, "there must be a showing of a 'substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant a declaratory judgment.'" *Hatcher v. Chairman*, 341 S.W.3d 258, 261 (Tenn. Ct. App. 2009) (quoting *Evers v. Dwyer*, 358 U.S. 202, 204 (1958)).

In the present case, there is no dispute between parties with real and adverse interests. Mr. and Mrs. A filed a joint petition along with C.B. and T.B. because they all agree that Mrs. A is the mother of the children. C.B. and T.B. have not attempted to assert any rights to the children adverse to those of Mr. and Mrs. A, nor has anyone else. Simply put, there is no "bona fide disagreement" to resolve, nor is there a right for Mr. and Mrs. A to "vindicate." The parties are not being compelled to do anything, or refrain from doing anything, based on a determination regarding who is the "legal mother." Our resolution of the issue would not resolve any real controversy.

13

We recognize that the Tennessee Department of Health has a difference of opinion with the petitioners regarding who would qualify as the children's "legal mother." In addition to litigating the issue regarding the children's birth certificate, the Department of Health also argued that C.B. should be declared the children's legal mother. However, this "dispute" appears to be nothing more than a simple difference of opinion. The Department has the authority to issue birth certificates, but it does not have the authority to declare who qualifies as the children's legal mother. During oral argument before this Court, counsel for the Department of Health stated that the Department's main concern in this case is regarding which mother it is required to list on the child's birth certificate, rather than who is designated the legal mother, which is only a "secondary concern" of the Department.

Unlike the facts in *In re C.K.G.* and *In re Baby*, there is no real legal controversy regarding the legal maternity of the children in this case. There is no disagreement among the parties to the surrogacy contract, nor is there a "tie" between two "mothers" who desire parental status. The only party challenging the legal maternity of Mrs. A is the Tennessee Department of Health, and it only does so in the context of this lawsuit. Under the circumstances of this case, the petitioners are not entitled to a declaration as to the children's "legal mother." The petitioners have failed to demonstrate a "'substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant a declaratory judgment.'" *Hatcher*, 341 S.W.3d at 261 (quoting *Evers*, 358 U.S. at 204). As the Middle Section of this Court stated in *In re Adoption of A.F.C.,* courts must decide issues in surrogacy cases on "particularly narrow grounds given their inherently policy-laden and administratively and fiscally momentous nature." 2014 WL 3540670, at *2 (quotation omitted). The "important and consequential issue" of designating the legal mother "should be left for determination in a case that presents an actual, ongoing controversy, or . . . should be resolved by the legislature." *Id.* at *3. This case does not present an actual, ongoing controversy regarding the legal maternity of the children at issue. We therefore vacate the juvenile court's finding regarding the legal maternity of the children.

We recognize the parties' frustration with the uncertainty in this area of the law. The effectiveness of the multi-factor test adopted in *In re C.K.G.* has been questioned due to its likelihood of producing inconsistent results based on the unique facts of various surrogacy cases. *See* Jane Marie Lewis, *New-Age Babies & Age-Old Laws: The Need for an Intent-Based Approach in Tennessee to Preserve Parent-Child Succession for Children of Assisted Reproductive Technology*, 43 U. Mem. L. Rev. 479, 488 (2012) (predicting that "courts will produce a hodgepodge of narrow and limitedly applicable rules" until surrogacy legislation is enacted); Christen Blackburn, Note, *Family Law— Who Is a Mother? Determining Legal Maternity in Surrogacy Arrangements in Tennessee*, 39 U. Mem. L.Rev. 349, 368 (2009) ("[T]he application of this decision will

undoubtedly lead to inconsistent results. These varying decisions will create a body of law that is unpredictable and unreliable. The best solution to this potential problem is the enactment of a comprehensive statute to ensure uniformity in the outcomes of surrogacy cases."). Tennessee's statutes "offer limited guidance as to how courts should handle surrogacy disputes." *In re Baby*, 447 S.W.3d at 837. Tennessee's limited and outdated surrogacy statute "lacks a clear process for persons to create, carry out, and enforce traditional surrogacy agreements" and leaves the parties and the courts "ill-equipped to deal with the complex questions that inevitably arise in this area of the law." *Id.* at 840. "There can be no denying that the ability to create children using assisted reproductive technology has far outdistanced the legislative responses to the myriad of legal questions that surrogacy raises." *In re Baby*, 447 S.W.3d at 841 (J. Koch, concurring). Surrogacy arrangements present numerous legal obstacles, and courts have generally been required "to muddle through the surrogacy thicket" without legislative guidance. *In re Baby*, 447 S.W.3d at 819 (quotation omitted). "The increasing popularity of surrogacy will only cause these problems to proliferate." *In re Baby*, 447 S.W.3d at 841 (J. Koch, concurring). In *In re Baby*, the Tennessee Supreme Court again encouraged the Tennessee General Assembly "to follow the lead of other state legislatures that have enacted statutes to address the fundamental questions related to surrogacy." *In re Baby*, 447 S.W.3d at 840. We share in the court's sentiment and urge the Tennessee General Assembly to give Tennessee's courts and citizens guidance in this important and increasingly complex area of the law. "By enacting a statute governing gestational surrogacy, the Tennessee General Assembly will afford infertile couples entering into a surrogacy contract confidence in the process and certainty in the results." 39 U. Mem. L. Rev. at 382.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby affirmed in part, vacated in part, and remanded for further proceedings. All remaining issues are pretermitted. Costs of this appeal are taxed one-half to the appellants, Mr. and Mrs. A, C.S.B., and T.B., and their surety, and one-half to the appellee, the Tennessee Department of Health, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE

15