COURT OF APPEALS
DECISION
DATED AND FILED

February 10, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2021AP51**

**STATE OF WISCONSIN**

Cir. Ct. No. 2019PA310PJ

**IN COURT OF APPEALS
DISTRICT IV**

IN RE THE PATERNITY OF M.K.W.:

JON RONALD KRUEGER,

    PETITIONER-RESPONDENT,

  V.

RACHELLE SIOBHAN WHARTON,

    RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Dane County: FRANK D. REMINGTON, Judge. *Affirmed.*

Before Blanchard, P.J., Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Jon Ronald Krueger filed this paternity action in an attempt to establish his parental rights to, and legal responsibilities for, M.K.W. The circuit court adjudicated him the father and made related rulings.   M.K.W.'s mother, Rachel Siobhan Wharton, has not disputed that Krueger is M.K.W.'s biological father.   Instead, on appeal Wharton challenges the following four circuit court decisions:  denial of her motion to remove the attorney acting as the guardian ad litem (GAL) for M.K.W.; denial of her motion to dismiss this action, without a paternity adjudication, on the ground that an adjudication would not be in M.K.W.'s best interest; granting of Krueger's request for joint custody; and granting of Krueger's request for partial placement.   We affirm each challenged ruling.

## BACKGROUND

¶2     For a combination of reasons, litigation in this paternity case has been unusually prolonged.   The following summary includes only events that, when considered together with additional facts referenced in the Discussion section below, are necessary to understand the specific issues addressed in this appeal and the grounds for our decisions.

¶3     Wharton and Krueger dated between September 2017 and February 2018.   Wharton gave birth to M.K.W. in September 2018.   Krueger filed this paternity action in April 2019.   *See* WIS. STAT. § 767.80(1)(d) (2019-20) (categories of persons who may bring paternity action include "[a] male alleged or alleging himself to be the father of the child).[1]   Krueger submitted supporting

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

affidavits and requested that a court commissioner hold a hearing to address "[t]he issues of paternity, custody, placement, support, health insurance and payment of birth expenses." It is undisputed that Krueger and Wharton have never been married and that neither was married to anyone else when M.K.W. was conceived.

¶4      Wharton moved to dismiss the action based on her averments that: Krueger "has no relationship with the minor child," meaning that he had no history of interactions with M.K.W.; Krueger "sexually assaulted [Wharton] when he had sexual intercourse with [her] without her permission after she repeatedly said no to him and explained to him that she wanted to remain abstinent"; Krueger "harassed [Wharton] during her pregnancy, which caused her extreme emotional distress"; and Wharton had obtained a harassment injunction that was then in place against Krueger.[2] Based on these allegations, Wharton contended that proceeding to an adjudication of paternity would not be in M.K.W.'s best interest and dismissal of this action was appropriate under WIS. STAT. § 767.855.

¶5      Krueger opposed the motion to dismiss and urged the court commissioner to hold an initial hearing to allow Krueger to present evidence

---

[2] Regarding the sexual assault allegation, Wharton specifically alleged in later proceedings that, during the course of their brief romantic relationship, Krueger had engaged in conduct that would constitute one or more violations of WIS. STAT. § 940.225(3) by engaging in sexual intercourse with her when she had not given consent, as that term is defined in § 940.225(4) (defining consent in pertinent part to mean "words or overt actions … indicating a freely given agreement to have sexual intercourse."). There was also reference to § 940.225(1)(a) (sexual intercourse without consent causing pregnancy).

Regarding the harassment injunction, it is undisputed that, between M.K.W.'s birth and the filing of this paternity action, Wharton obtained a four-year harassment injunction against Krueger (lasting until February 11, 2023) in Dane County Circuit Court based on her allegations that Krueger had harassed her over the course of the prior year and used the telephone and email for abusive and threatening communications.

supporting his position "that proceeding with a genetic determination of paternity is in the child's best interests."

¶6    In June 2019, a commissioner appointed attorney John Louderman as the GAL for M.K.W. and he conducted a preliminary investigation. The circuit court took over the case from the commissioner.

¶7    At a circuit court hearing, Wharton did not dispute that Krueger is M.K.W.'s biological father. Her argument was that, regardless of that fact, the circuit court should consider evidence that she argued would establish that Krueger had non-consensual sexual intercourse with her and, based on this evidence, the court should dismiss the action pursuant to WIS. STAT. § 767.855. That statute provides that the court may dismiss a paternity action if it determines that making a paternity determination would not be in the child's best interest.[3] The GAL informed the court that Krueger and Wharton had given the GAL "two entirely different" versions of historical events. For this reason, the GAL indicated that the circuit court needed to conduct an evidentiary hearing and make

---

[3] WISCONSIN STAT. § 767.855 provides in pertinent part:

> [A]t any time in an action to establish the paternity of a child, upon the motion of a party or guardian ad litem, the court or supplemental court commissioner … may, if the court or supplemental court commissioner determines that a judicial determination of whether a male is the father of the child is not in the best interest of the child, dismiss the action with respect to the male, regardless of whether genetic tests have been performed or what the results of the tests, if performed, were. Notwithstanding [citing provisions not pertinent here], if genetic tests have not yet been performed with respect to the male, the court or supplemental court commissioner is not required to order those genetic tests.

relevant factual findings before the GAL could make properly informed recommendations to the court about what would be in M.K.W.'s best interest.

¶8 Krueger filed a brief and affidavit with attachments purporting to reflect communications between Wharton and Krueger intended to counter Wharton's allegations of non-consensual sexual intercourse and harassment. Krueger also argued that he "has a constitutionally protected liberty interest in his putative paternity" and that "a judicial determination of whether Krueger is [M.K.W.'s] father is in [M.K.W.'s] best interest." Wharton filed a new affidavit, aimed at countering averments in Krueger's affidavit.

¶9 At a hearing in October 2019, the circuit court took evidence from two witnesses called by Wharton. Separately, the court made a referral to the Family Court Services agency for a study by a family court counselor, which would not be completed until August 2020, due in part to the emergence of the pandemic.

¶10 As discussed in more detail in the Discussion section below, in December 2019, immediately before a scheduled hearing for the resumption of testimony, Wharton filed a motion requesting that the circuit court terminate Louderman's GAL appointment, accompanied by supporting affidavits from Wharton and her attorney. The circuit court denied this motion.

¶11 Also in December 2019, at a resumed evidentiary hearing regarding Wharton's motion to dismiss, the circuit court heard testimony from Wharton, Krueger, and others. The circuit court determined that dismissal of this action would not be in M.K.W.'s best interest and denied the motion. The court remanded the case to the commissioner with directions to enter a judgment of paternity, which the commissioner did in February 2020. The paternity judgment

awarded sole legal custody to Wharton on an interim basis. In March 2020, the commissioner issued an interim order establishing prospective child support payments that Krueger was obligated to pay and granting Krueger weekly placement with M.K.W. in "a therapeutic setting" as arranged by the GAL.

¶12     In July 2020, Krueger filed a motion to change physical placement "to be at least 50/50 ASAP," and alleged that "placement as ordered is not taking place."

¶13     The author of the Family Court Services study concluded in August 2020 that she lacked sufficient information to recommend a specific placement schedule. But she did recommend that Krueger continue to have regular, supervised visits with M.K.W. at least once a week. The author opined that such visits would further the goal of making Krueger a more regular part of M.K.W.'s life, and not merely "a visitor" to the child, who was about to turn two.

¶14     At a continued evidentiary hearing in October 2020, the court heard additional testimony from Wharton and Krueger, as well as testimony from: the family court counselor who wrote the study; Krueger's employer at a child day care center where Krueger was then employed; an employee of a social service agency where Krueger had supervised visits with M.K.W.; and Wharton's partner, who testified that he considered himself to be "a father figure" to M.K.W. At the close of this hearing, the circuit court made rulings that included the following. Applying the relevant terms of WIS. STAT. § 767.41(2), which guides determinations of joint or sole custody, the court awarded the parties joint custody, giving Wharton impasse authority regarding medical decisions. Regarding the physical placement schedule, the court removed the condition that Krueger was required to see M.K.W. only when under supervision by a third party. Instead, the

court adopted (with slight modifications) the GAL's detailed schedule recommendation, essentially giving Wharton nine total days and Krueger five total days in a repeating two-week schedule. The court also ordered child support based on the standard guidelines for a shared placement schedule.

## DISCUSSION

### I.    DENIAL OF MOTION TO REMOVE GAL

¶15    Wharton argues that the circuit court erroneously exercised its discretion in denying her motion to remove attorney Louderman as the GAL because the court should have made one or both of the following rulings: (1) failing to remove the GAL would deprive Wharton of her substantive due process right against arbitrary, wrong, or oppressive state action or (2) the GAL would not, or could not, perform his statutory duties. Wharton's underlying argument is that the circuit court should have removed the GAL because, she submitted, he had expressed outmoded attitudes and understandings on the topic of sexual assault and demonstrated an unwillingness to consider Wharton's allegations that Krueger had sexually assaulted her. We agree with Krueger and the GAL (who has submitted an appellate brief to address this issue exclusively) that Wharton fails to establish that the circuit court erroneously exercised its discretion based on either of the two grounds she raises.

¶16    We review a circuit court decision regarding the appointment of a guardian for an erroneous exercise of discretion. *See* ***Tamara L.P. v. County of Dane***, 177 Wis. 2d 770, 774-75, 785-86, 503 N.W.2d 333 (Ct. App. 1993) (circuit court erroneously exercised its discretion in appointing attorney as GAL for a ward in temporary guardianship proceedings because the attorney had previously acted as adversary counsel in the involuntary commitment proceedings; under the

7

"substantial relationship" test, the circuit court was required as a matter of law to disqualify the attorney based on a potential conflict of interest). We uphold a circuit court's discretionary decision if the court "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Long v. Long*, 196 Wis. 2d 691, 695, 539 N.W.2d 462 (Ct. App. 1995).

¶17    "Whether state action constitutes a violation of due process presents a question of law, which this court decides independently." *State v. Neumann*, 2013 WI 58, ¶32, 348 Wis. 2d 455, 832 N.W.2d 560.

¶18    Wharton purports to draw from *Tamara L.P.* the general proposition that, as Wharton puts it, a circuit court erroneously exercises its discretion when the court "declines to discharge a guardian ad litem who does not, or cannot, perform his [or her] statutory duty." For purposes of resolving this appeal we accept that as a correct statement of the law.

### A.    Additional Background

¶19    Wharton's motion to remove attorney Louderman was filed six months after his appointment as GAL. It was based on the following averments in affidavits that Wharton and her attorney submitted to the circuit court.

¶20    Wharton averred the following. She, her attorney, and Louderman had an out-of-court, in-person conversation in December 2019. During this conversation, the topic of the alleged sexual assault was discussed. Louderman at one point said, "'if it were a traditional rape, as in the case of a stranger, that might affect my recommendation but…'" (ellipse in original). Wharton did not hear what came next, either because she was too upset or because she left the room.

¶21 In her motion to remove attorney Louderman, Wharton argued that the implication of attorney Louderman's alleged statement was that he inaccurately believed that there is a distinction under Wisconsin law between a sexual assault committed by a person known by the victim (more specifically, a person in a domestic relationship with the victim) and the same act committed by a stranger to the victim, and that this inaccurate understanding rendered attorney Louderman unfit to be a GAL in this paternity case.

¶22 The second averment was made by Wharton's counsel, based on hard copies of two emails allegedly exchanged between counsel and attorney Louderman. The first email was from Wharton's counsel to attorney Louderman. It states in its entirety (with the salutation and signature block removed):

> I did not have the statute in front of me during our interview, but [WIS. STAT. §] 767.407 provides that a guardian ad litem does have a responsibility to investigate whether there is evidence of domestic abuse:
>
> [WIS. STAT. §] 767.407
>
> **(4)** RESPONSIBILITIES. The guardian ad litem shall be an advocate for the best interests of a minor child as to paternity, legal custody, physical placement, and support. The guardian ad litem shall function independently, in the same manner as an attorney for a party to the action, and shall consider, but shall not be bound by, the wishes of the minor child or the positions of others as to the best interests of the minor child. The guardian ad litem shall consider the factors under s. 767.41(5)(am), subject to s. 767.41(5)(bm), and custody studies under s. 767.45(14). The guardian ad litem shall investigate whether there is evidence that either parent has engaged in interspousal battery, as described in s. 940.19 or 940.20(1m) or domestic abuse, as defined in s. 813.12(1)(am), and shall report to the court on the results of the investigation. The guardian ad litem shall review and comment to the court on any mediation agreement and stipulation made under s. 767.45(12) and on any parenting plan filed under s. 767.41(1m). Unless the child otherwise requests, the guardian ad litem shall communicate to the court the wishes of the child as to the child's legal custody

> or physical placement under s. 767.41(5)(am)2. The guardian ad litem has none of the rights or duties of a general guardian.

The second email accompanying counsel's affidavit was a purported response by attorney Louderman to the first email, which stated in its entirety (again, without salutation or signature line):

> I am in receipt of your email and the statutes. As I believe I indicated to you multiple times in our meeting, I have investigated and the results of my investigation will be used in the issue of placement if your motion [to dismiss the action without adjudication] is denied. I do not believe that you can bootstrap the statute with regard to sexual assault to this statute. Further, I am not the trier of fact and I do not believe that there is a clear understanding of the facts available to me.

Emphasizing the sentence that includes the word "bootstrap," Wharton argued to the circuit court that this "indicate[s] that he does not believe sexual assault is domestic violence … and that it is not his job to investigate whether or not sexual assault occurred."

### B. Circuit Court Ruling

¶23 Attorney Louderman failed to provide the circuit court with evidence or explanation regarding the averments just summarized. The circuit court, without making any factual findings on these topics, assumed without deciding that the averments were accurate. Based on those assumptions, the court said that it was "troubled" by statements attributed to attorney Louderman. However, the court concluded that the following two factors weighed against granting the motion: the need for the court to resolve the case in a timely fashion, and the limited role of a GAL in a paternity action as compared with the responsibilities of the court to understand all relevant facts and correctly apply the legal standards. For these reasons, the court ruled that the specific concerns that Wharton raised

regarding alleged attitudes and understandings of attorney Louderman did not merit his removal.

### C. Analysis

¶24 The purported substantive due process basis for Wharton's argument is unsupported and undeveloped. First, it depends on the sweeping, unsupported assertion that allowing attorney Louderman to continue in his role "impermissibly tainted the entire proceeding." At best, Wharton asks us to speculate about a pervasive taint that, in unidentified ways, might have flowed from attorney Louderman's alleged attitudes and understandings related to the topic of sexual assault. Second, Wharton does not direct us to legal authority for the proposition that a circuit court presiding over a paternity action is obligated under the circumstances as she alleged them to terminate a GAL appointment to protect the substantive due process rights of one parent. It is sufficient to note that Wharton does not explain, based on legal authority, what substantive due process rights a parent could have regarding the identity of the GAL, who represents the interests of the child, not the rights of the parent. *See* WIS. STAT. §§ 767.407, 767.82(1); *Hollister v. Hollister*, 173 Wis. 2d 413, 418, 496 N.W.2d 642 (Ct. App. 1992) ("the guardian ad litem is first and foremost an advocate for the child's best interests").

¶25 This leaves the argument that the circuit court erroneously exercised its discretion because Wharton demonstrated that the GAL would not, or could not, perform his statutory duties. We conclude that the record supports the discretionary decision of the circuit court, which was based on factors that Wharton fails to adequately address.

¶26    We infer that the first alleged statement by the GAL, about "traditional rape," necessarily raised for the circuit court a legitimate issue as to whether the GAL was willing and able to fulfill his statutory duties on the facts of this case. However, as we explain further beginning in the next paragraph, this alleged statement essentially stands alone as a basis for Wharton's motion because the GAL's statements in the email were, at worst, ambiguous in suggesting improper attitudes or understandings by the GAL. Given that interpretation of the record, we conclude that the circuit court's reasoning was sufficient to support denial of the motion, even assuming a problematic attitude and understanding reflected in the "traditional rape" comment.

¶27    It is not clear what the GAL meant in his email by stating, "I do not believe that you can bootstrap the statute with regard to sexual assault to this statute." Wharton's counsel apparently did not seek to clarify what the GAL meant at the time of their communications. Further, whatever the precise meaning of this "bootstrap" reference, it appears to have involved one or more legal conclusions. As the circuit court noted, it had an independent duty to interpret the law regardless of any legal conclusions reached by the GAL. Further, the court held extensive evidentiary hearings to take testimony directly, not filtered through the investigative lens of the GAL. Notably, in its discussion with the parties the circuit court made clear that, whatever attorney Louderman intended to convey to Wharton and her counsel in making the alleged "traditional rape" comment, the court *itself* did not draw a false distinction between an act of sexual assault that is committed by a stranger to the victim or instead committed by a non-stranger, explaining correctly that it is "domestic abuse" to have sexual intercourse with a woman who does not consent to it while in a domestic relationship.

12

¶28    Turning to the investigation topic, the out-of-court references by the GAL to the investigation topic might have been ambiguous. But in any case, they did not make clear that attorney Louderman would not investigate or participate in the investigation of alleged domestic violence. Wharton now suggests that the circuit court was obligated to interpret the statements as demonstrating an unwillingness to look into or consider her claim of domestic abuse through nonconsensual sexual intercourse. But the GAL stated in the email that he had investigated. Further, he suggested the view that his investigatory role as GAL could be satisfied in pertinent part through his observation of testimony in court hearings, as supplemented by fact finding by the circuit court. This view was entirely consistent with our background summary above that the GAL urged the circuit court to hold an evidentiary hearing to address conflicts between the accounts given by Wharton and Krueger. It cannot reasonably be disputed that a GAL in this context can sufficiently "investigate" through his or her participation in evidentiary court hearings. Summing up on this point, one reasonable interpretation of the GAL's email was that he needed counsel for the parties to elicit testimony in court, which he anticipated happening, before he could gain, as he put it, "a clear understanding of the facts available to me."

¶29    Finally on this topic, it significantly undermines Wharton's argument that her briefing fails to address the circuit court's reasoning that the delays that would necessarily result from granting the motion weighed against granting it. This would have involved the time needed to identify and appoint a new GAL and then to allow this person to duplicate all of attorney Louderman's work to get up to speed in a relatively complicated paternity action. The court understandably wanted to avoid unnecessarily further prolonging a paternity action involving a two-year-old child who had little or no familiarity with a

biological father who was seeking a parental role through judicial process. Through silence on the delay topic, Wharton now essentially concedes that, in exercising its discretion, the circuit court could acknowledge concern about the GAL's attitudes or understanding of the law but ultimately place significant weight on the need for the court, applying relevant facts to pertinent law, to resolve the case in a timely fashion.

## II. DENIAL OF WHARTON'S MOTION TO DISMISS THIS PATERNITY ACTION

¶30    Wharton argues that the circuit court erred in denying her motion to dismiss Krueger's paternity action, rejecting her argument that adjudication "is not in the best interest of the child" pursuant to WIS. STAT. § 767.855.

¶31    We review best-interest determinations in paternity proceedings by accepting circuit court factual findings unless they are clearly erroneous, but we determine the child's best interest de novo. *See Douglas L. v. Arika B.*, 2015 WI App 80, ¶18, 365 Wis. 2d 257, 872 N.W.2d 357.

### A. Circuit Court Explanation Of Ruling

¶32    The circuit court made statements that included the following in support of its ruling denying the motion to dismiss.

¶33    Regarding the sexual assault allegations, the court said in part that it believed that it was not "required to make a finding on whether there was a sexual assault," "nor will I make the legal conclusion," but that the court had "considered [what] I believe to be relevant [among] all the underlying facts." When considered in context with other comments made by the court, we interpret the court's observations as follows. In addressing the motion to dismiss, the court was

not obligated to make a specific finding as to whether Krueger had sexually assaulted Wharton, but the court had taken into account all of Wharton's relevant allegations, including those of sexual assault. The court proceeded to explain that, regardless of whether Krueger had sexually assaulted Wharton, in some respects Wharton "exemplif[ies] a classic case of a victim of domestic abuse." The court further said, "So I want to make very clear, nothing I say or do here should give you the suggestion that I disagree or that I don't understand your outlook. I do understand your outlook." The court further said to Wharton,

> it does not seem to be in your best interest [for you] to have any contact with Mr. Krueger. I do believe that you've satisfied me that it's more likely than not that your relationship with him was one in which [there] was relentless pressure to do the things that he wanted you to do.

Thus, having clarified that it did not need to make a finding on the sexual assault topic in order to resolve the motion to dismiss, the court essentially found that Wharton's testimony was truthful from her point of view and that Krueger had at times applied "relentless pressure" on Wharton, although the court did not make a finding of sexual assault through unconsented sexual intercourse.

¶34     On a related topic, at one point during the hearing, the circuit court explicitly recognized that, if it denied the motion to dismiss (as it proceeded to do), then in addressing the subsequent, separate issue of custody, the court would be presented with the following consideration: whether Wharton, as an alleged victim of domestic abuse, might have "the benefits of the … rebuttable presumption of sole custody." This was an unmistakable reference to the rebuttable presumption in WIS. STAT. § 767.41(2)(d)1. Specifically, under § 767.41(2)(d)1., joint custody is rebuttably presumed to be "detrimental to the child and contrary to the best interest of the child" if one party has committed acts

15

of domestic abuse as defined in WIS. STAT. § 813.12(1)(am), which includes first and third degree sexual assault. *See supra* note 2. In sum, and significant to our discussion on a related topic below, the court explicitly recognized that, in denying the motion to dismiss, the court created the necessity that it would eventually have to determine in this case whether the rebuttable presumption applied when it addressed the custody issue.

¶35 Having made these points, the court said that the ultimate issue before it was not "about what's in Ms. Wharton's best interest," but instead "what's in [M.K.W.'s] best interest."

¶36 The court noted that Wharton had testified that she did not think that Krueger should be in M.K.W.'s life due to what she contended were Krueger's histories of alcohol abuse, underemployment, "not respecting [Wharton's] boundaries," mental health issues, and smoking. However, the court suggested, these issues could potentially be addressed by Krueger and adequately managed by him. Further, the court noted, the court itself could, through orders issued later in the proceedings, help increase the odds that Krueger would address these issues. That is, the court could address each of these concerns during later phases of the case as they might specifically relate to the best interest of M.K.W. For example, Krueger could be ordered to undertake a drug and alcohol assessment as a condition of custody and placement, and if a problem were revealed he would have to follow treatment recommendations.

¶37 The court said in part, "I can't say that a man with an alleged alcohol problem or depression or [who] smoke[s] cigarettes or [is] even a narcissist, just in the abstract, it[']s never in the best interest of a child to have contact with that

16

person." As part of this discussion, the court noted that "every day in family court" conditions are placed on parents to advance the best interest of children.

> [W]hat is in [M.K.W.'s] best interest? Not to have a parent with an alcohol problem.
>
> It's in [M.K.W.'s] best interest to have parents who are successfully employed so they can both provide for financial support.
>
> It's in [M.K.W.'s] best interest, as [for] any child, to be raised by parents who are seeking treatment for anxiety or depression.
>
> It's never in children's best interest to be around … parents who smoke anything, tobacco or marijuana.

¶38 Addressing in particular Wharton's concern about Krueger "not respecting [Wharton's] boundaries," the court said that this concern was premature. This was so, the court explained, because if the court were to deny the motion to dismiss and then, in addressing custody, if it were to determine that Krueger "didn't have boundaries," the court could award sole custody to Wharton, in order to "relieve" her "of having the obligation to seek permission" on various issues from Krueger. The court emphasized that it could ultimately award Wharton "sole custody and primary placement without any visitation," or instead award "joint custody with equal placement," depending on all of the information before the court at later stages of the proceedings.

¶39 The circuit court made findings that Wharton and Krueger have a "self-destructive relationship" and "can't co-parent." For these reasons, the court said, it would be in M.K.W.'s best interest to proceed to adjudication of paternity and then for Krueger, with direction contained in potential court orders, to take steps to "moderate the abusive behavior, and to limit the exposure that creates a

17

cycle of abuse, and that can be done by the family court after the family court gets information as the [case] progresses through the system."

¶40     The circuit court also determined that it is in M.K.W.'s "best interest to know who his biological father is.  He's going to ask [who his father is] some[]day."  Further, the court said, "what might be in [M.K.W.'s] best interest is requiring his father to provide financial support."  If adjudicated the father, Krueger would have "an obligation to provide financial support for his child independent of custody and placement decisions, which come next," and "an obligation, where appropriate, to provide emotional support for his child."

**B.     Analysis**

¶41     Wharton purports to identify three sets of loosely related assertions that she submits are grounds for reversing the circuit court decision denying her motion to dismiss the action and not adjudicate fatherhood.[4]  None of the three is well developed.  She argues that:  (1) the court "failed to consider that Krueger had no existing right to parent M.K.W."; (2) the court failed to recognize "Wharton's interest in maintaining the sanctity of her family, where the evidence would have supported findings that Krueger sexually assaulted and harassed Wharton"; and (3) the court interpreted the "best interest" in WIS. STAT. § 767.855 "so narrowly as to render irrelevant the evidence" that M.K.W. was "thriving" under Wharton's care, that Krueger sexually assaulted and harassed Wharton, that

---

[4] To clarify, Wharton did not dispute in the circuit court, and she does not dispute now, that if the court properly denied her motion to dismiss this action then the court should enter a paternity judgment naming Krueger as the father.

18

"Krueger abused alcohol, and that Wharton's health and ability to parent [M.K.W.] would suffer if she were forced to co-parent with Krueger."

¶42 In her first set of assertions Wharton contends that the circuit court, in explaining its decision, was obligated to explicitly state "at the outset of its analysis" that it was taking into account the fact that Krueger had no history of interactions with M.K.W. She purports to base this on the legal principle that, as our supreme court has explained, "parental status that rises to the level of a constitutionally protected liberty interest does not rest solely on biological factors, but rather, is depend[e]nt upon an actual relationship with the child where the parent assumes responsibility for the child's emotional and financial needs." *See Randy A.J. v. Norma I.J*., 2004 WI 41, ¶16, 270 Wis. 2d 384, 677 N.W.2d 630.

¶43 The following are sufficient reasons to reject any potentially developed aspects of these assertions. First, the issue before the circuit court was not whether Krueger had or lacked a constitutionally protected fundamental liberty interest in his parentage—or, if that should have been part of the analysis, Wharton fails to explain why that is the case. As the circuit court appropriately emphasized at the hearing, the specific issue was whether entering an adjudication that Krueger is M.K.W.'s legal father would, in itself, not be in M.K.W.'s best interest. *See* WIS. STAT. § 767.855. Second, the record is replete with evidence that the circuit court was acutely aware of the lack of contact that had occurred between Krueger and M.K.W. (it is referred to in numerous filings and discussions in court). The circuit court was further aware of the undisputed fact that Wharton had, to date, *actively prevented* any contact between Krueger and M.K.W., a fact that Wharton makes no attempt to address in connection with this argument. Wharton specifically testified that she never allowed Krueger to meet M.K.W. and that she did not want Krueger to be a part of M.K.W.'s life.

¶44     Wharton's second set of assertions is especially difficult to track, but we reject it at a minimum because it depends on an unsupported premise. The unsupported premise is that the circuit court was obligated to determine that a paternity adjudication would "disrupt the existing, positive relationships and family structure in [M.K.W.'s] life." As summarized above, the court explained why it determined that Krueger could be expected to address and manage pertinent issues that Wharton raised and also that the court would have ample opportunity, when it made subsequent decisions in the case, to address all of the specific potential disruptions to M.K.W.'s life and relationships that Wharton sought to avoid. Wharton fails to address the court's explanation for its ruling on its own terms, showing why it is erroneous.

¶45     As part of the second set of assertions, Wharton may intend to argue that it was error for the circuit court, in addressing the motion to dismiss, not to state an explicit finding as to whether Krueger had sexually assaulted Wharton. If she intends to make this argument, we reject it as undeveloped and insufficiently tied to the focus of WIS. STAT. § 767.855, which turns entirely on the best interest of the child. We also note that the circuit court made clear that in reaching its decision it took into account all of Wharton's testimony, including her specific testimony, credited by the court, that Krueger had subjected her to "relentless pressure to do the things that he wanted [her] to do," albeit without finding that this included sexual assault.

¶46     In Wharton's third set of loosely related assertions she essentially argues that the circuit court erred because it purported to base its decision denying her motion to dismiss on its ability, at the time of future custody and placement decisions, to address the issues she raised as primary objections to an adjudication of fatherhood. She contends this was error because this approach rested on an

overly narrow interpretation of WIS. STAT. § 767.855. The "too narrow" aspect of the ruling, she contends, is that the court failed to consider "all factors" bearing on M.K.W.'s best interests, because it considered some factors to be resolvable only at later stages of the proceedings. *See W.W.W. v. M.C.S.*, 161 Wis. 2d 1015, 1037, 468 N.W.2d 719 (1991) ("A determination of what is in the best interests of the children must be made considering all factors which weigh upon the children's interests."). Under the standard that the circuit court applied, Wharton contends, courts would be obligated to reject virtually all arguments that a paternity adjudication "is not in the best interest of the child" pursuant to WIS. STAT. § 767.855.

¶47 Wharton fails to persuade us that the circuit court misapplied WIS. STAT. § 767.855 by failing to consider all relevant facts related to M.K.W.'s best interest at the time of the adjudication decision. The court made a case-specific, supported determination that all of the evidence showed that it would be in M.K.W.'s best interest for there to be an adjudication of fatherhood, even if some of that evidence tended to weigh against such an adjudication, and would have to be explored further in determining custody and placement. This included determining that Krueger could be expected to manage and minimize the issues that were of concern to Wharton. Wharton fails to recognize that, in referring to later decisions the court would have to make, the court was reasonably providing broader context for its ultimate ruling regarding adjudication. That is, in the course of explaining the ultimate conclusion regarding adjudication, the court noted that an adjudication—*in combination with* later court decisions about custody, physical placement, and support—would together result in the best overall outcomes for M.K.W. That was not impermissibly narrowing the analysis. The court was simply recognizing the results of all rulings that the court would be

21

obligated to make and how, by their nature, the rulings would relate to M.K.W.'s best interests in different ways. As part of this reasoning, the court was attempting to reassure Wharton that adjudication in itself would not necessarily result in shared custody or sole custody for Krueger or in any particular amount of physical placement with Krueger. Put differently, Wharton fails to show that the court did not address all relevant factors based on the evidence before the court at the time of the challenged ruling, reasonably anticipating steps that the court could take to address Wharton's concerns in making later decisions in the case.

### III. JOINT CUSTODY

¶48 Wharton argues that the circuit court was obligated to award her sole custody because it should have made factual findings that "Krueger domestically abused Wharton," meaning subjected her to sexual intercourse without her consent, "and erred when it awarded joint custody based on its finding that there was a presumption of joint custody." We reject this argument on two grounds. First, the only reasonable way to interpret the record is that, in making its custody ruling, the court determined that it could not find by a preponderance of the evidence that Krueger had subjected Wharton to domestic abuse through acts of sexual assault, as she claimed. Second, Wharton fails to establish that in making this finding the circuit court committed clear error.

¶49 "'Custody determinations are matters within the trial court's discretion and will be sustained on appeal where the court exercises its discretion on the basis of the law and the facts of record and employs a logical rationale in arriving at its decision.'" *Jocius v. Jocius*, 218 Wis. 2d 103, 110-11, 580 N.W.2d 708 (Ct. App. 1998) (quoted source omitted). On this issue, Wharton essentially challenges the circuit court's credibility findings. Determinations regarding

witness credibility are left to the circuit court as the trier of fact. *See* ***State v. Kimbrough***, 2001 WI App 138, ¶29, 246 Wis. 2d 648, 630 N.W.2d 752.

### A. Additional Background

¶50 The court explained that it would be guided on the custody issue by the terms of WIS. STAT. § 767.41(2), which is a multi-faceted provision that we need not quote at length, given the limited arguments presented by the parties. Significantly for the issue raised on appeal, the court at the outset cited § 767.41(2)(am), which provides that the court is generally to presume that joint legal custody is in the best interest of the child. This is significant because, in explaining that it would apply the general statutory presumption, the circuit court clearly signaled that it would *not* be applying the rebuttable presumption in § 767.41(2)(d)1. for which Wharton advocated. As previously noted, the rebuttable presumption comes into play only if the court "finds by a preponderance of the evidence that a party has engaged in … domestic abuse, as defined in [WIS. STAT. §] 813.12(1)(am)." If the court had found that the rebuttable presumption against joint custody applied it would not have made sense to cite the general presumption in favor of joint custody.

¶51 Proceeding with our summary, the court noted that the GAL recommended joint legal custody as being in M.K.W.'s best interest. The court further said that, in "consider[ing] the statutory factors," it had benefitted from the Family Court Services report and recommendation, "which tracks the statutory criteria."

¶52 The circuit court said that it was "particularly troubled" that Wharton was not "particularly interested in fostering a relationship between [M.K.W.] and Mr. Krueger," leaving Mr. Krueger alone "to fashion his own

relationship with his child, frankly not counting on Ms. Wharton contributing much to that endeavor."

¶53     The court noted the pending harassment injunction that Wharton had obtained against Krueger, which the court said could be a potential factor in determining custody. However, the court further observed that the judge who had issued the injunction specifically stated in the injunction that "issues of child custody and placement will be determined by the family court," raising a "reasonable inference" that the issuing judge "did not intend that that injunction be grounds for this Court making decisions on child custody and placement," but instead intended "the opposite."

¶54     The court ordered the parties to use an identified shared parenting tool for online communication, which the court noted is designed to control the use of inappropriate language and to protect the a party from "intimidation and abuse" by the other party.

¶55     The court observed that the "extremely capable and experienced lawyers" for each side could alert the court if there were "abuses" "by either party" that might call for "modifications of the order or contempt."

¶56     The court declined "to order treatment for either parent," noting that "both parents have struggled and continue to struggle," but that "I don't doubt both parents' love … for [M.K.W.] and [appreciation of] the importance of maintaining sobriety at all times."

B.     Analysis

¶57     We conclude that the circuit court properly exercised its discretion on the custody issue on the basis of the facts and the law, supplying a logical set of

rationales. This conclusion is based in part on the more specific conclusion that the only reasonable interpretation of the record is that the circuit court determined that there was insufficient evidence to support a finding of the factual predicate for the rebuttable presumption claimed by Wharton: domestic abuse based on sexual assault.

¶58 Wharton suggests that the circuit court committed reversible error in making the joint custody decision because it failed to make factual findings as to whether Krueger sexually assaulted Wharton. It would have been preferable for the sake of clarity if the circuit court had explicitly stated that it did not find the factual predicate for the rebuttable presumption. However, it is evident that, while the court deemed aspects of Wharton's testimony to be credible, in reaching its custody decision the court deemed the factual predicate to be unmet. The rebuttable presumption was specifically raised with prominence by Wharton several times over the course of the proceedings—including in writing immediately in advance of the hearing at which the court made the custody decision. Further, as noted above, the circuit court acknowledged at an earlier stage in the proceedings that it was aware that it would have to address the issue of whether the rebuttable presumption applied.

¶59 To the extent that Wharton attempts to argue that the circuit court erroneously exercised its discretion in failing to find the factual predicate, the attempt is based on selective references to the record. We now provide a summary that includes evidence that could undermine a finding that Krueger sexually assaulted Wharton.

¶60 Pertinent testimony by Wharton included the following. During the course of their six-month relationship, she consented to "cuddling, kissing,

25

massages," sending him nude pictures of herself, and "sexting" (exchanging sexual comments in text messages). She told him that she wanted to refrain from sexual intercourse until marriage, but after she told him that, he nevertheless had sexual intercourse with her without her consent and after he coerced her. One assault occurred in the first month they began dating. After that incident she started spending most of her time at Krueger's residence and travelled with him to Europe. When they were in France she told him that she would have sex with him if he would get them a hotel room instead of their having to sleep in a car, and he got a hotel room and they had consensual intercourse. Over the course of their relationship, Krueger sexually assaulted her a total of "between 10 and 15 times."

¶61　The record before the circuit court included potentially relevant statements by Krueger that included the following. During their romantic relationship, Wharton told Krueger that she did not want to have sex before marriage, but she was also "extremely sexually aggressive" and inconsistent in her conduct regarding sexual intercourse. When Wharton told Krueger that she was pregnant, she indicated that M.K.W. was likely conceived before Wharton and Krueger took a trip to Europe between December 31, 2017, and January 15, 2018. Wharton ended the relationship abruptly in February 2018 after becoming annoyed with him while he was playing the guitar. Krueger denied that he had ever had sexual intercourse with Wharton without her consent and said that Wharton never alleged sexual assault until after their relationship ended.

¶62　On this record, the court could have reasonably determined that it could not find that the factual predicate for the rebuttable presumption against joint custody was met.

¶63 This leaves Wharton's assertion that the circuit court "erred when it disregarded all of the evidence that Wharton introduced that Krueger had engaged in abusive behavior," which apparently rests heavily on the fact that Wharton obtained a harassment injunction against Krueger in February 2019. However, as summarized above, the court did not ignore the injunction in making its custody decision. Instead, the court noted its existence and made an implicit finding that it did not weigh significantly in the analysis. Wharton fails to develop an argument that this constituted an erroneous exercise of discretion. Further, Wharton appears to acknowledge that the existence of the injunction in itself did not trigger the rebuttable presumption.

## IV. FIVE DAYS OF PLACEMENT FOR KRUEGER EVERY TWO WEEKS

¶64 The final issue does not require extensive discussion, because the record reflects exhaustive, focused discussion on the physical placement topic by the circuit court and the parties at the final evidentiary hearing and Wharton does not develop an argument that the circuit court erroneously exercised its discretion in making a decision that, it should be noted, awarded her the majority of the placement time.

¶65 As with circuit court custody decisions, we review physical placement decisions for an erroneous exercise of discretion. *Rosecky v. Schissel*, 2013 WI 66, ¶29, 349 Wis. 2d 84, 833 N.W.2d 634.

¶66 Wharton acknowledges that the circuit court properly referenced the statutory factors as its touchstone. *See* WIS. STAT. § 767.41(5)(am). However, she asserts that "nowhere did the court explain how its examination of the evidence under the mandated factors led to its decision." In support of this argument,

Wharton cites to only two of the 14 pages of the transcript specially focused on placement. Further, she fails to come to grips with the fact that the court adopted the GAL's placement recommendations, which itself was based on one of two schedules proposed by Wharton herself.

¶67 Wharton makes an unclear argument about a statement of the circuit court that we reject for at least the reason that, as far as Wharton develops the argument, it depends on the inaccurate premise that the circuit court awarded equal physical placement.

¶68 Wharton also briefly asserts that the circuit court did not comply with WIS. STAT. § 767.41(6)(a), which requires that in final orders, "[i]f legal custody or physical placement is contested, the court shall state in writing why its findings relating to legal custody or physical placement are in the best interest of the child." However, she does not explain how a reasonable interpretation of § 767.41(6)(a), including any potential remedy or remedies that might be proper based on a violation of that statute, should be applied to the circuit court's actual rulings in this case. To analyze this issue, we would at a minimum have to develop these elements of an argument for Wharton.

## CONCLUSION

¶69 For all these reasons, we reject each of the arguments that Wharton advances on appeal and affirm the challenged circuit court rulings.

*By the Court*.—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.